UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

THE AYCO COMPANY, L.P.,

                    Plaintiff,

        -against-                                    1:11-CV-0580 (LEK/DRH)

WOLFGANG K. FRISCH; STEFAN W.
OGLEVEE,

                    Defendants.

_____

**MEMORANDUM-DECISION and ORDER**

## I.      INTRODUCTION

On May 24, 2011, Plaintiff The Ayco Company, L.P. ("Ayco" or "Plaintiff") filed this

instant action seeking a temporary restraining order ("TRO") and preliminary injunction against

Defendants Wolfgang Frisch and Stefan Oglevee ("the Defendants" or "Frisch" and "Oglevee").

Dkt. No. 1.  Frisch and Oglevee are former employees of Ayco and resigned in May 2011 to work

for UBS, an Ayco competitor.  Specifically, Ayco alleges that Frisch and Oglevee breached the non-

compete clauses of contracts that they entered into with Ayco, misappropriated confidential

information and trade secrets, engaged in unfair competition, and breached fiduciary duties that they

owed to Ayco.  Id.  In addition to damages, Ayco seeks injunctive relief pursuant to Rule 65 of the

Federal Rules of Civil Procedure to prevent Frisch and Oglevee from engaging in this allegedly

violative conduct.  Id.; Pl.'s Mot. for a temporary restraining order and preliminary injunction (Dkt.

No. 9) ("PI motion").

On May 25, 2011, the Court granted Plaintiff's request for a TRO enforcing a ninety-day

non-compete agreement entered into by the parties.  In doing so, the Court enjoined Defendants

from using or divulging Plaintiff's confidential information and trade secrets; and requiring the immediate return of any such material in Defendants' possession.  Dkt. No. 7.  The Court has received additional submissions and held a Show Cause hearing on June 7, 2011, to determine whether a preliminary injunction enjoining the same conduct covered by the TRO through August 10, 2011, for Defendant Oglevee, and August 17, 2011, for Defendant Frisch, is warranted.  Id.; see also Def.'s Opp. to PI Motion (Dkt. No. 19) ("Opposition"); Pl.'s Reply to Opposition (Dkt. No. 22) ("Reply").  Upon consideration of the submissions, oral arguments, and applicable law, the Court grants Plaintiff's request for preliminary injunctive relief.

## II.    BACKGROUND

Ayco is a financial services company that provides comprehensive financial counseling and education services for corporate executives and employees and wealthy individuals.  Dunphy Aff. (Dkt. No. 9-1) ¶ 3; Clancy Aff. (Dkt. No. 9-2) ¶ 5.  Ayco provides a broad range of services including tax and estate planning, wealth transfer, insurance planning, investment management, benefits and compensation strategies, and retirement planning.  Clancy Aff. ¶ 6.  Ayco was incorporated in the state of New York forty years ago, during which time it has achieved an extensive client base.  Cavoli Decl. (Dkt. No. 22-1) ¶ 3.  It has accomplished this largely by developing relationships with corporations and entering into contracts to provide financial services to the senior executives of those corporations as part of their compensation package.  Id.; Clancy Aff. ¶¶ 5-6.  Ayco continues to service a number of these executives after they retire.  Clancy Aff. ¶ 5.

Ayco is registered with the Securities and Exchange Commission, but it is not a broker dealer and is not registered with the Financial Industry Regulatory Authority ("FINRA").  Cavoli

Decl. Ex. H (Dkt. No. 22-9) ¶¶ 10-11, 17.  Its affiliates include other investment advisors, insurance

agencies, real estate brokerages, securities broker-dealers, commodities and future advisors, and

banks.  Id. ¶ 10.  One affiliate, Mercer, is a broker-dealer and member of FINRA, but its "authority

to do business is based on its own independent license with FINRA."  Id. ¶¶ 14-15.  Both Ayco and

Mercer are wholly owned subsidiaries of The Goldman Sachs Group, Inc.  Id. ¶ 14.  Ayco is the sole

limited partner of Mercer; Mercer's general partner, GS Ayco Holding LLC, is the sole limited

partner of Ayco.  Id. n.2.

Ayco hired Oglevee to work in its Albany office in September 1998, and Frisch to work in

its California office in November 2000.  Oglevee Aff. (Dkt. No. 15) ¶ 6; Frisch Aff. (Dkt. No. 16) ¶

6.  In May 1999, Oglevee was transferred to Ayco's California office and continued to work in that

office for the remaining twelve years of his employment with Ayco.  Oglevee Aff. ¶ 6.  As a

condition of employment, both Defendants were required to become licensed as registered

representatives of FINRA.  Oglevee Aff. ¶ 8; Frisch Aff. ¶ 9.  On May 12, 2011, Oglevee resigned

from Ayco to begin working for UBS Financial Services ("UBS"), in UBS's Newport Beach,

California office.  Oglevee Aff. ¶ 2.  Frisch did the same a week later on May 19, 2011.  Frisch Aff.

¶ 2.

Both Defendants were initially hired to work as staff attorneys and became account

managers in the course of their employment; neither brought financial counseling clients with him

to Ayco when he was hired.[1]   Clancy Aff. ¶ 9-11.   Ayco trained the Defendants as account

managers, and, over the years, they serviced many clients for Ayco.  Id. ¶¶ 12-13.  Many of these

---

[1] Ayco's business practice is to deliberately recruit people with little experience in the
financial industry and train them in its own practices.  Clancy Aff. ¶ 62.

3

were Ayco clients prior to Defendants' joining the company.  Id. ¶ 17.  Only one of these clients had

a preexisting relationship with the Defendants, and only one of the corporate relationships that

generated Defendants' client relationships was developed by the Defendants.  Id.  At the time of his

departure from Ayco, Oglevee was responsible for approximately seventy-one clients in six different

states, worth a total of $75.9 million in aggregate assets.  Id. ¶ 15.  When Frisch left Ayco, he was

responsible for approximately seventy client relationships in four different states worth $135 million

in aggregate assets.  Id. ¶ 16.  Both Defendants claim that they received little help from Ayco in

recruiting clients and that they developed many relationships with Ayco's existing clients "because

the relationship with Ayco had been damaged and [their] client skills were used to save the

relationship."  Oglevee Aff. ¶¶ 51-58; Frisch Aff. ¶¶ 43-49.

Upon being hired, both Defendants signed Employee Agreements Regarding Confidential

and Proprietary Information and Materials.  Compl. Ex.'s A, B (Dkt. Nos. 1-1 and 1-2).  That

agreement was revised in 2010 to include a new non-compete provision; a reduced non-solicitation

period following termination (from two years to six months);[2] an altered compensation scheme for

account managers; and a grant to account managers of access to certain confidential information.

Cavoli Decl. ¶ 19.  On June 29, 2010, Oglevee signed this Agreement; Frisch signed the Agreement

on July 1, 2010.  Compl. Exs. A and B (Dkt. Nos. 1-1 and 1-2) ("Agreement").  Under the

Agreement, Ayco stipulated that it would provide Defendants with resources for acquiring,

soliciting, and servicing clients, and "establishing and developing goodwill with Ayco's Clients and

---

[2] See Agreement § II.A.3 (prohibiting employee for six months after his or her termination
from "soliciting" any Ayco client to whom the employee rendered "Services" on behalf of Ayco
during the prior twenty-four months or any prospective client whom the employee solicited on
behalf of Ayco during the prior twelve months).

Prospective Clients on behalf of Ayco."  Agreement § II.A.1.  The Agreement's "Goodwill" clause

continues,

> In consideration for Ayco's promise, specified in § II.A.1. above, the Employee agrees to use the resources provided by Ayco solely to acquire Clients, solicit Prospective Clients, build relationships and goodwill with Ayco's Clients and Prospective Clients solely on behalf of Ayco . . . .  Employee further agrees not to misappropriate or otherwise use Ayco's goodwill with its Clients for the benefit of any entity or individual other than Ayco . . . .

Id. § II.A.2.

The Agreement required Defendants to acknowledge that, in connection with their

employment, Ayco would provide them with

> certain valuable and confidential information and trade secrets, created and developed at Ayco's expense and not generally known within the financial services industry, which information includes, but is not limited to, information regarding the identity, assets, financial needs and preferences of Clients and Prospective Clients, information regarding the financial affairs, personnel matters, products, and operating procedures, of Ayco, its employees, its Clients and certain third parties . . . and numerous forms, documents, written materials and computer programs created and developed by Ayco for the purpose of rendering Services to its Clients and Prospective Clients, and the proprietary methods, formulas, plans and other work product which they represent.

Id. § II.B.1.  By signing, Defendants agreed to "maintain the confidentiality of all Ayco Proprietary

Information that [they have] received," use such proprietary information solely for purposes

authorized by Ayco, and, upon their termination, immediately return all of Ayco's property to the

company.  Id.

Under the Agreement's Termination clause, Defendants agreed that they would give Ayco

ninety days notice of termination, during which time they would remain Ayco employees and

continue to receive their base salary or salary draw, but would no longer participate in Ayco's

compensation plan.  Id. § II.D.  The clause contains a non-compete provision which reads,

In the event the Employee terminates employment before the expiration of the Notice of

Termination Period or terminates employment without giving notice, employee covenants that for the balance of the Notice of Termination Period or, if no notice is given, ninety (90) days . . . the Employee will not associate (including but not limited to association as an individual, sole proprietor, officer, employee, partner, director, consultant, agent or advisor) with any Competitive Enterprise in the United States where, in connection with such association, Employee is engaged in providing [financial counseling, brokerage, estate, tax and insurance planning and/or asset management services], and the period of the restrictions provided for in paragraph 11.A.3 above shall be increased, if no notice is given, by ninety (90) days. . . or the unfulfilled balance of the Notice of Termination Period if notice has been given.

Id. § II.D.

Finally, the Agreement provides that,

Employee further acknowledges that the restrictions contained herein are reasonable and necessary to protect the legitimate interests of Ayco and do not impose any greater restraint than is reasonably necessary to protect the confidential information, goodwill, training, and other business interests of Ayco and that the enforcement by Ayco of the provisions contained herein, will cause no undue hardship on the Employee. Employee further acknowledges that in the event of a breach of the provisions of this Agreement, Ayco will not have an adequate remedy at law. Employee therefore agrees that Ayco shall be entitled to temporary, preliminary, and permanent injunctive relief for any violation of Sections II A, B, C and D.

Id. § II.E.2.

On July 28, 2010, Frisch signed an additional Trade Secrets, Confidentiality and Company Property Agreement ("TSA"), which Oglevee also signed on August 6, 2010.  Compl. Exs. C and D (Dkt Nos. 1-3 and 1-4).  The TSA reiterates the importance of Ayco's relationship with its clients, and it expressly states that by virtue of an employee's employment with Ayco, that employee will be entrusted with confidential and proprietary business and financial information belonging to Ayco and its clients.  TSA at 1.  The TSA defines and gives examples of "Trade Secrets" and "Confidential Information," which include:

client lists (whether prepared by you or others at Ayco, and including client information contained within performance reviews or compensation documents), information regarding

the identity, assets, financial needs and preferences of clients and prospective clients, information regarding the financial affairs, personnel matters, products, and operating procedures of Ayco, its employees, its clients, its parent entities, and other related third parties . . . and numerous forms, documents, written materials and computer programs created and developed by Ayco for the purpose of rendering services to its clients and prospective clients, and the proprietary methods, formulas, plans and other work product.

Id. § I.B.  Finally, the TSA requires a signatory to "agree to use Ayco Proprietary Information solely for the purposes authorized by Ayco . . . [and] further agree not to take, retain, disclose, misappropriate, or otherwise use Ayco Proprietary Information for your personal benefit or for the benefit of any entity or individual other than Ayco . . . ."  Id. § I.C.

Defendants' alleged breaches of the Agreement and TSA form the basis of this action. Plaintiff alleges that Defendants breached the non-compete, goodwill, and confidentiality provisions, and by virtue of their employment at UBS, will inevitably divulge Ayco's confidential and proprietary information.  PI Mot. at 11-12, 21.  Plaintiff further asserts that Frisch and Oglevee "appear to have surreptitiously misappropriated substantial amounts of Ayco client information just before they left.  Defendants accessed and printed information from Ayco's computer system relating to a number of clients in the days and weeks prior to his resignation."  Clancy Aff. ¶ 3. Plaintiff's employees have stated that the company's printing logs indicate that Frisch as well as Oglevee printed out unusually large amounts of documents in the weeks prior to their respective departures.  Veronica Lay Aff. (Dkt. No. 22-10) ¶¶ 7-13; Jim Lang Aff. (Dkt. No. 22-11) ¶ 5.  A number of these documents were printed from Ayco's Client Database and Private Wealth Management ("PWM") Database, both of which contain information about, *inter alia*, their clients' assets, contact information, the pricing of Ayco's services to these clients, and "client relationship reports" with detailed information about clients' investments.  Lay Aff. (Dkt. No. 22-10) ¶¶ 7-13;

Clancy Aff. ¶¶ 38-44, 47-51.  Both databases are also password-protected, and Ayco's Client Database requires employees before they access it to click "OK," and thereby agree, that "information contained in this database constitutes the confidential, trade secret and proprietary business information of Ayco."  Lay Aff. ¶ 11.  Additionally, on May 9, 2011, three days before his resignation, records show - and Oglevee admits - that he printed his entire Outlook contact list, which contained non-public client contact information.  Oglevee Aff. ¶ 62.  Plaintiff further notes that at least one of Frisch's clients and five of Oglevee's have advised Ayco that they are moving to UBS, and that others have indicated to Ayco that they are considering doing the same.  Id. ¶¶ 57-61.

Defendants deny printing and taking documents from Ayco to ease their transition to UBS, stating that their accessing clients' information in the days and weeks prior to their resignations was done in the normal course of business working for Ayco.  Oglevee Aff. ¶¶ 60-73; Frisch Aff. ¶¶ 51-61, 64-71.  Oglevee does admit to having had "Compensation Reports," which contain, *inter alia*, client contact lists, the names of Plaintiff's corporate and individual clients, confidential information regarding clients' accounts with Goldman Sachs and Fidelity Securities and the amount of assets in those accounts, and Ayco pricing and fee information for its clients.  Oglevee Aff. ¶ 79; Cavoli Decl. ¶¶ 26-27.  While contending that he has a right to this information, pursuant to the TRO, he entrusted to his attorney all of the Compensation Reports in his possession; Oglevee's attorney subsequently provided these materials to Ayco.  Oglevee Aff. ¶ 79; Cavoli Decl. ¶¶ 25-26.   With regard to Ayco clients moving to UBS, both Defendants attribute these clients' choices to their own performance as account managers, and argue that their clients "should be free to do business with whomever they feel will best address their needs and provide the services they seek."  Frisch Aff. ¶ 82; Oglevee Aff. ¶ 85.

8

Defendants additionally claim that the agreements upon which Ayco relies were presented to them on a "take it or leave it basis," that if they did not sign them, they would be fired.  Oglevee Aff. ¶¶ 19-23; Frisch Aff. ¶¶ 14-16.  They characterize the agreements as unfair because they prevent Defendants from pursuing their chosen profession and Defendants' clients from working with the financial advisors of their choice, and because the agreements do not provide for adequate compensation during the Notice period.  Frisch Aff. ¶¶ 83, 88; Oglevee Aff. ¶¶ 86, 90.

Shortly after Defendants' resignations, Plaintiff filed a Complaint on May 24, 2011, and a Motion for a temporary restraining order and preliminary injunction on May 25, 2011.  Dkt. Nos. 1, 9.  While the Court granted the request for a TRO on May 25, 2011, see Dkt. No. 7, Plaintiff also seeks preliminary injunctive relief enjoining Defendants from: 1) associating with an Ayco competitor, where such association involves Defendants' providing financial counseling, brokerage, estate, tax and insurance planning and/or asset management services during a period of not less than ninety days from May 12, 2011 for Oglevee, and May 19, 2011 for Frisch; 2) copying, reproducing, giving, divulging, revealing, or otherwise disclosing any form, document, written material, or computer program, or any method, formula, or plan created, developed, or utilized by Defendants, as employees of Ayco, or by Ayco; and 3) copying, reproducing, giving, divulging, revealing, or otherwise disclosing any confidential business information of Ayco or any client of Ayco and requiring that Defendants return all copies of Ayco's confidential business information.  Dkt. No. 9.

In compliance with the Court's May 25, 2011 Order granting the TRO, Defendants have ceased working for UBS.  Oglevee Aff. ¶ 84; Frisch Aff. ¶ 80.  Defendants have received paystubs reflecting their earned but unused vacation time, but have not been paid their base salaries.  Frisch Aff. ¶ 88; Oglevee Aff. ¶ 17.  However, in its papers and at oral argument, Plaintiff stipulated it

would pay Defendants their base salaries for the duration of the Notice period should an injunction issue.  Clancy Aff. ¶ 71; Order to Show Cause ("OSC") Hr'g Tr. 3:7-23.

## III.    STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right."  Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 129 S. Ct. 365, 376 (2008) (citation omitted).  In this Circuit, a court shall grant a motion for a preliminary injunction only where the party seeking the injunction can show "(1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." NXIVM Corp. v. Ross Institute, 364 F.3d 471, 476 (2d Cir. 2004); Faiveley Transp. Malmo AB v. Wabtec Corp, 559 F.3d 110, 116 (2d Cir. 2009).  "Such relief . . . is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  Moore v. Consol. Edison Co. of New York, Inc., 409 F.3d 506, 510-511 (2d Cir. 2005) (quotations and citations omitted).

## IV.    DISCUSSION

Defendants argue that injunctive relief should not issue for four main reasons: first, that the non-compete clauses in the contracts between the defendants and Ayco are unenforceable under California law, which, they claim, governs this case; second, that Ayco cannot establish either a likelihood of success on the merits or sufficiently serious questions going to the merits of the case because no misappropriation or misuse of trade secrets has occurred; third, that Ayco has failed to establish irreparable harm in the absence of an injunction; and fourth, that the balance of hardships tips in Defendants' favor.  See Def.'s Memorandum of law opposing injunctive relief (Dkt. No. 19)

10

("DML").  For the reasons below, the Court finds that each of these arguments fails.

### A. Choice-of-Law Analysis

As a threshold matter, the Court must determine which state's law governs these claims.  In a diversity case, a court must apply the choice of law rules of the state in which it sits.  Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941).  In New York, courts follow the "substantial relationship" test, under which they will honor the parties' choice of forum in a contract unless (1) the chosen state has no substantial relationship to the parties; or (2) applying the law of the chosen state would contravene a fundamental policy of a state that has a materially greater interest than does the chosen state.  Estee Lauder v. Batra, 430 F. Supp. 2d 158, 170 (S.D.N.Y. 2006) (quoting Restatement (Second) of Conflicts of Law § 187) (citations and quotations omitted).

Here, Defendants argue that (1) California has a materially greater interest in this litigation than does the state of New York; and (2) applying New York law would contravene a fundamental policy of the state of California against non-compete clauses.[3]  DML at 4-7.  Addressing the first of these arguments, Plaintiff contends that New York law should govern because it is headquartered in New York; both Defendants have traveled to New York in the course of their employment with Ayco, and Defendants relied on various services provided by the New York office in conjunction with their work in California.  PI Mot. at 12-16.  Defendants counter that California nonetheless has

---

[3] Defendants argue in the alternative that the clause is unenforceable under New York law, essentially reiterating the arguments they presented before the Court - and which the Court rejected - in Ayco v. Feldman, No. 1:10-CV-1213, 2010 WL 4286154 (N.D.N.Y. Oct. 22, 2010).  See DML at 14-19.  Defendants acknowledge this but "respectfully ask the Court to reconsider these arguments here, and reach a different result."  Id. at 14 n.10.  The Court has reviewed the arguments in Defendants' Opposition, and reaffirms the results it reached in Feldman.  With reference to its finding in Feldman, which involved precisely the same non-compete clause and agreements at issue here, the Court again concludes that this clause is enforceable under New York law.  See Feldman, 2010 WL 4286154, at *8-10.

11

a materially greater interest in the litigation, citing to the fact that they both live and work in California; they also portray Ayco's corporate structure as decentralized, Ayco's California office as "largely self-contained," and their contact with the New York office sporadic at best.  See DML at 6-7; Oglevee Aff. ¶¶ 27-50; Frisch Aff. ¶¶ 20-42.

Having considered the parties' various contacts with New York and California in this case, the Court agrees with Plaintiff that California does not have a materially greater interest in this litigation than does New York.  Although the Defendants were located in California, Plaintiff is headquartered in New York; all of its significant internal groups and divisions are based in New York, and its offices in New York employ nearly eight hundred people.  Clancy Aff. ¶ 28; OSC Hr'g Tr. 4:14-19.  Unlike the defendants in Prod. Res. Grp. L.L.C. v. Oberman, No. 03 Civ. 5366, 2003 WL 22350939 (S.D.N.Y. Aug. 27, 2003), and SG Cowen Sec. Corp. v. Messih, No. 00 Civ. 3228, 2000 WL 633434 (S.D.N.Y. May 17, 2000), the work Defendants undertook as Ayco employees was not wholly "centered" in California, insofar as many of Ayco's significant functions – including opening client investment accounts, facilitating the sale of all annuities and insurance policies to clients, and deciding whether to hire or fire employees – are located in New York .  Cavoli Decl. ¶¶ 9, 11, 14; see also Estee Lauder v. Batra, 430 F. Supp. 2d 158, 171 (S.D.N.Y. 2006).  Defendants' modest characterization of themselves as "simple account managers, who report to managers in California," belies the fact that their work itself was carried out under the management and control of a New York-based company, as Defendants of necessity availed themselves of training opportunities and other resources provided by the New York offices in the course of managing their clients' accounts.  DML at 7; Oglevee Aff. ¶¶ 30, 43; Frisch Aff. ¶ 24; Clancy Aff. ¶¶ 29-33; see also Batra, 430 F. Supp. 2d at 172 (finding New York and not California law governed where

12

California defendant's employment relationship to New York employer "does not overwhelmingly point to New York," but the management and control of the company was in New York).  Upon consideration of these factors, the Court is disinclined to depart from the parties' choice of law in the agreements at issue and cannot conclude that Defendants' location and work in California confers on California a materially greater interest in this action than on the state of New York.

More importantly, New York has a significant interest in protecting companies located in this state and providing them with "access to a convenient forum which dispassionately administers a known, stable, and commercially sophisticated body of law."  Marine Midland Bank, N.A. v. United Missouri Bank, N.A., 643 N.Y.S. 2d 528 (1996), cited in Batra, 430 F. Supp. 2d at 172. Defendants correctly point out that California has a strong policy, embodied by statute, against noncompete clauses in employment agreements.  DML at 4-7; Cal. Bus. & Prof. Code. § 16600 (providing that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void.") What Defendants have failed to note, however, is that this policy does not apply in the context of preventing employees from misappropriating employers' trade secrets.  The California Supreme Court case to which Defendants cite, Edwards v. Arthur Andersen LLP, 189 P.3d 285 (2008), noted the existence of "the so-called trade secret exception to section 16600," but also noted that such an exception did not apply in Edwards because the plaintiff was not disputing that portion of his noncompetition agreement.  Id. at 289 n.4; see also Batra, 430 F. Supp. 2d at 173 ("Although restrictive covenants are enforceable under California law where there has been a misappropriation of trade secrets, Estee Lauder has not demonstrated that to date there has been such a misappropriation.") (emphasis added).  Given that Plaintiff in this case has alleged misappropriation or misuse of trade secrets by Defendants,

13

California's general policy against non-compete clauses affords an exception for the types of agreements at issue here. See ReadyLink Healthcare v. Cotton, 126 Cal. App. 4th 1006, 1022 (Cal. Ct. App. 2005) ("[I]f a former employee uses a former employer's trade secrets or otherwise commits unfair competition, California courts recognize a judicially created exception to section 16600 and will enforce a restrictive covenant in such a case.") (quotation omitted); Morlife, Inc. v. Lloyd Perry, 66 Cal. Rptr.2d 731 (Cal. Ct. App. 1997) (permanently enjoining defendants from misappropriating former employer's customer list to compete with entities who switched business from defendants' former employer to their new employer); Swenson v. T-Mobile USA, Inc., 415 F. Supp. 2d 1101, 1104 (S.D.Cal. 2006) (dismissing California action in favor of breach of contract and misappropriation of trade secrets claims filed first in Washington state court, pursuant to forum selection clause in employment agreement with one-year non-compete clause).  Thus, California does not have a materially greater interest in this case than does New York, nor would the application of New York law in this case contravene a fundamental policy of California.  For these reasons, the Court will honor the parties' choice of law in the contract and apply New York law to Plaintiff's contractual claims.

Defendants further submit that California law governs Plaintiff's non-contractual claims, as they arise in tort and are therefore outside the scope of the Agreement's choice of law provision. DML at 8 n.5.  As a response, Plaintiff has argued only that Defendants' alleged conduct "would be subject to restraint universally," and that California and New York law protect the same types of material as trade secrets.  PI Mot. at 9 n.5; Reply at 1.  "Under New York law . . . tort claims are outside the scope of contractual choice-of-law provisions that specify what law governs construction of the terms of the contract, even when the contract also includes a broader forum-selection clause."

Finance One Public Co. Ltd. v. Lehman Bros. Special Financing, Inc., 414 F.3d 325, 335 (2d Cir.

2005). Although the Agreement's forum selection clause provides that the Court shall have

jurisdiction over "any suit arising out of or relating to this Agreement," the choice of law provision

states only that "[t]his Agreement shall be governed by and construed and enforced in accordance

with the laws of the State of New York, without giving effect to any conflict of laws provisions."

Agreement § II.E.5. New York courts in this Circuit have refused to extend similarly worded

clauses to govern tort claims as well as contract claims. See Finance One, 414 F.3d at 335; Krock v.

Lipsay, 97 F.3d 640, 645 (2d Cir. 1996) (choice of law provision did not apply to fraud claim where

it stated only that "[t]his Mortgage shall be governed by and construed in accordance with the laws

of the Commonwealth of Massachusetts."); Chiste v. Hotels.com L.P., 756 F. Supp. 2d 382, 411

(S.D.N.Y. 2010); cf. Turtur v. Rothschild Registry Intern, Inc., 26 F.3d 304, 309-10 (2d Cir. 1994)

(finding choice of law provision in contract applied to tort claims where said provision was stated to

cover any controversy "arising out of or relating to" the contract). As the choice of law provision in

this Agreement states only that the Agreement shall be construed and enforced according to New

York law, this choice of law provision does not govern Plaintiff's non-contractual claims.

     However, contrary to Defendants' assertion, New York law does govern these claims as

well. In determining which state's law to apply in tort actions, New York courts undertake a

different analysis than they do in contract cases. First, the Court must consider whether an actual

conflict exists between the state laws that are implicated here. Innoviant Pharmacy v. Morganstern,

Civ.A. No. 5:05-CV-0470, 390 F. Supp. 2d 179, 187 (N.D.N.Y. 2005). If such a conflict exists, the

Court must apply the law of the state with the greatest interest in the litigation. White Plains Coat &

Apron Co., Inc. v. Cintas Corp., 460 F.3d 281, 284 (2d Cir. 2006).

With respect to the first question, the Court considers that New York and California's laws governing the types of claims at issue here are not materially different.  Compare Ashland Mgmt. v. Janien, 82 N.Y.2d 395, 407 (1993) (defining a trade secret as "any formula, pattern, device, or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it") (citing Restatement of Torts § 757, comment b) and Ashland Mgmt., 82 N.Y.2d at 407 (describing factors to be considered on a trade secrets claim as "(1) the extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the business] to guard the secrecy of the information; (4) the value of the information to [the business] and [its] competitors; (5) the amount of effort or money expended by [the business] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others") (citing Restatement of Torts § 757, comment b); with Cal. Civ. Code § 3426.1(d) (defining trade secret as "information including a formula, pattern, compilation, program, device, method, technique, or process, that: (1) derives independent economic value, actual or potential from not being known to the general public or to other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.").  Compare also Mandelblatt v. Devon Stores, Inc., 132 A.D.2d 768, 769 (1st Dep't 1987) ("[a] fiduciary relation exists between two persons [or entities] when one of them is under a duty to act for . . . the benefit of another upon matters within the scope of the relation[ship].") and Byrne v. Barrett, 268 N.Y. 199, 206 (1935) (holding that employee has duty "not to use confidential knowledge acquired in his employment in competition with his principal"); with Mattel, Inc. v. MGA Entm't, Inc., No. CV 04-

16

9049, 2010 U.S. Dist. LEXIS 136922, at *157, *160 (C.D.Cal. Dec. 27, 2010) (in order to be charged with a fiduciary duty, a person must "knowingly undertake to act on behalf and for the benefit of another, or must enter into a relationship which imposes that undertaking as a matter of law," and holding that employees had fiduciary duty to maintain confidentiality of proprietary information); and Bus. Networks of N.Y., Inc. v. Complete Network Solutions, Inc., No. 605463/98, 1999 WL 126088, at *5 (N.Y. Sup. Ct. Feb. 19, 1999) ("A claim of unfair competition will lie where a former employee misappropriates and exploits confidential information belonging to the former employer in abuse of the relationship of trust.") with ReadyLink Healthcare, 126 Cal. App. 4th at 1021 ("[A] former employee's use of confidential information obtained from his former employer to compete with him and to solicit the business of his former employer's customers, is regarded as unfair competition.") (quotations and citations omitted).  Having examined the law in both jurisdictions, the Court concludes that no actual conflict exists between New York and California law on these claims.

Turning to the "interest" prong of the analysis, the Court also finds that New York has the greater interest in having its law applied in this case.  Although the narrow wording of the choice of law provision precludes the Court from applying it to the tort claims in this case, the alleged conduct that gave rise to Plaintiff's tort law claims is the same as that which gave rise to its breach of contract claims.  The Court thus considers that it is both efficacious and reasonable for New York law to apply to the tort claims as well.  See White Plains Coat, 460 F.3d 281, 284 (applying New York law to tort claims where "[t]he contracts that were allegedly interfered with were governed by New York law."); see also Innoviant, 390 F. Supp. 2d at 187 (finding New York's greater interest in having its tort law apply to unfair competition and trade secret misappropriation claims "given New

York's status as the forum state in this matter").  Moreover, although the allegedly tortious conduct occurred in California, the "vast majority of the alleged harm" occurred in New York, where Plaintiff is headquartered.  Id. at 284; see also Krock, 97 F.3d at 646 (noting that New York courts may apply substantive law of another state where, even if alleged tort occurred in New York, plaintiffs suffered their injuries in the other state).  For these reasons, in addition to the factors discussed above giving New York a materially greater interest in this litigation, the Court will also apply New York law to Plaintiff's tort claims.

### B. Irreparable Harm

"A showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" Faiveley, 559 F.3d at 118 (quoting Rodriguez v. DeBuono, 175 F.3d 227, 234 (2d Cir. 1999)); Natsource LLC v. Paribello, 151 F. Supp. 2d 465, 469 (S.D.N.Y. 2001). Irreparable harm is characterized "as certain and imminent harm for which a monetary award does not adequately compensate."  Wisdom Import Sales Co. v. Labatt Brewing Co., 339 F.3d 101, 113-14 (2d Cir. 2003).  Merely speculative harm is insufficient to establish irreparable harm.  See Tom Doherty Associates, Inc. v. Saban Entertainment, Inc., 60 F.3d 27, 37 (2d Cir. 1995).

Plaintiff has established in its Motion several potential bases for a finding of irreparable injury.  First, "[g]enerally, when a party violates a non-compete clause, the resulting loss of client relationships and customer good will built up over the years constitutes irreparable harm." Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc., 323 F. Supp. 2d 525, 532 (S.D.N.Y. 2004); see also RESCUECOM Corp. v. Mathews, No. 5:05-CV-1330, 2006 WL 1742073, at *2 (N.D.N.Y. June 20, 2006); Innoviant, 390 F. Supp. 2d at 189; Ecolab, Inc. v. Paolo, 753 F. Supp. 1100, 1110 (E.D.N.Y. 1991); BDO Seidman v. Hirshberg, 93 N.Y.2d 382, 392 (1999) (an employer "has a legitimate

18

interest in preventing former employees from exploiting or appropriating the goodwill of a client or customer, which had been created and maintained at the employer's expense, to the employer's competitive detriment").  Monetary damages are insufficient to compensate such loss, as it is "very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come." Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 69 (2d Cir. 1999).

Moreover, "[i]f the unique services of [an] employee are available to a competitor, the employer obviously suffers irreparable harm." Ticor, 173 F.3d at 69; see Natsource, 151 F. Supp. 2d at 469 (an employer plaintiff will suffer irreparable harm if a defendant employee breaching a 120-day non-compete clause "is allowed to immediately work for a competitor, or otherwise solicit these customers, [as] these customers are likely to follow him because of their unique relationship," thereby depriving the plaintiff of the benefit of its bargain); Kelly v. Evolution Markets, Inc, 626 F. Supp. 2d 364, 376 (S.D.N.Y. 2009); see also Eurobrokers Capital Markets, Inc. v. Flinn, No. 93 Civ. 3785, 1993 WL 213026, at *1 (S.D.N.Y. June 16, 1993).

Finally, the loss of an employer's confidential customer information also constitutes irreparable harm. See, e.g., North Atlantic Instruments, Inc. v. Haber, 188 F.3d 38, 49 (2d Cir. 1999) (citing FMC Corp. v. Taiwan Tainan Giant Indus. Co., 730 F.2d 61, 63 (2d Cir. 1984)); Wenner Media LLC v. Northern & Shell North Am. Ltd., No. 05 Civ. 1286, 2005 WL 323727, at *3-*4 (S.D.N.Y. Feb. 8, 2005); Eurobrokers, 1993 WL 213026, at *1 (citing Ecolab, 753 F. Supp. at 1110); Euro-Cut, Inc. v. Futersak, 476 F. Supp. 2d 218, 227 (E.D.N.Y. 2007).  Where an employee agrees that breach of a post-employment competition provision will leave an employer without adequate remedy at law and will entitle it to injunctive relief, that agreement may be suggestive of

the irreparable injury the employer suffers in its breach.  Ticor, 173 F.3d at 69; Innoviant, 390 F.

Supp. 2d at 189 (confidentiality provision in an agreement stating that serious irreparable harm

would flow from its breach buttresses a conclusion of irreparable injury).

Applying this standard, the Court concludes that Ayco has made the necessary showing that,

absent an injunction, it will suffer irreparable harm as a result of Defendants' actions.  In the less

than two weeks that elapsed between Oglevee's abrupt resignation on May 12, 2011 (and in the case

of Frisch, who resigned on May 19, less than one week) and the filing of the Complaint on May 24,

at least one of Frisch's clients and several of Oglevee's advised Plaintiff that they would be moving

to UBS.  Compl. ¶ 54; Clancy Aff. ¶ 57.  On May 19, 2011, one week after Oglevee's departure and

Ayco's subsequently reaching out to his clients to transition their accounts to other account

managers, a client stated in an e-mail to an Ayco representative that although he and his wife "have

been with Ayco for a long time and have always enjoyed the unique professionalism and

commitment from your firm," they "are comfortable with staying with [Oglevee] (who knows us)."

Clancy Aff., Ex. E (Dkt. 9-2) at 57.  This e-mail indicates that an existing client with a positive

relationship with Ayco that was built, in part, through Ayco's effort and expense, was lost to the

company as a result of Oglevee's departure and immediate employment with UBS.  The loss of such

relationships and client goodwill is more than speculative and constitutes irreparable injury.  BDO

Seidman, 93 N.Y.2d at 392 ("The employer has a legitimate interest in preventing former employees

from exploiting or appropriating the goodwill of a client or customer, which had been created and

maintained at the employer's expense, to the employer's competitive detriment."); see also

Feldman, 2010 WL 4286154, at *7.

Defendants assert, as the defendant did in Feldman, that Ayco's services are not unique and

20

that they did not provide any unique services to Ayco.  DML at 18.  The Court again rejects this argument and reiterates its finding in Feldman: "[W]here, as here, a financial services employee breaching a non-compete provision is engaged in developing and maintaining client relationships on behalf of his or her employer, and those relationships are cultivated, in part, through the employer's resources, that employee's services are generally deemed 'unique.'" 2010 WL 4286154, at *7 (citing Natsource, 151 F. Supp. 2d at 474 ("The uniqueness requirement relates to the employee's relationships")).  As such, the loss of Ayco's clients to a competitor in violation of an agreement results in irreparable harm to Ayco.  Id.

So too does the loss of confidential customer information resulting from Defendants' conduct.  North Atlantic Instruments, 188 F.3d at 49.  Plaintiff alleges several instances of Defendants' misuse of proprietary and confidential information.  Oglevee admitted to possessing Compensation Reports, see Oglevee Aff. ¶ 79, despite provisions in the Agreement and TSA stating that he would immediately return such property upon his termination.  See TSA (including as confidential information, "client lists (whether prepared by you or others at Ayco, and including client information contained within performance reviews or compensation documents), information regarding the identity, assets, financial needs and preferences of clients and prospective clients").  Oglevee's assertion that he never looked at or used the materials after his departure from Ayco is insufficient to support a finding of no irreparable harm.  Feldman, 2010 WL 4286154, at *7.

Likewise, Defendant Frisch's insistence that he took no confidential records or documents whatsoever is insufficient to preclude a finding of irreparable harm.  See North Atlantic Instruments, 188 F.3d at 42, 49 (affirming preliminary injunction where defendant claimed he had not removed any confidential documents from his former place of employment).  That Frisch has contacted

21

multiple clients - at least one of whom he contacted the very day he resigned from Ayco - also suggests a possibility that he removed a list of clients that may constitute confidential information to Ayco.  Dunphy Aff. ¶¶ 7-8; see also Feldman, 2010 WL 4286154 at *7.  In sum, neither Frisch nor Oglevee's denials of wrongdoing preclude a finding of irreparable harm here.

The above conclusion that Plaintiff satisfies the irreparable injury prong is bolstered by the fact that Defendants expressly agreed that breach of the non-compete clause would leave Plaintiff without an adequate remedy at law and his "agree[ment] that Ayco shall be entitled to temporary, preliminary, and permanent injunctive relief for any violation of" the Goodwill, Confidentiality, Solicitation, or Termination provisions of the Agreement.  Agreement § II.E.2; Ticor, 173 F.3d at 69; Innoviant, 390 F. Supp. 2d at 189.

**B.  Likelihood of Success on the Merits**

Plaintiff's Complaint recites four causes of action: breach of contract; misappropriation of confidential information and trade secrets; breach of fiduciary duties; and unfair competition. Plaintiff's ability to show either a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor, on any of these causes of action, if linked to one of the above bases for a finding of irreparable harm, is sufficient for this Court to grant preliminary injunctive relief.  Innoviant, 390 F. Supp. 2d at 195-96; Kelly, 626 F. Supp. 2d at 376.

*1.  Breach of Contract*

At the outset, the Court notes that Defendants devote much of their Motion to the same arguments the Court deemed unavailing on the breach of contract claim in Feldman.  DML at 8-18, 19-21.  Defendants' Motion acknowledges that the Court previously addressed these issues and

22

requests the Court to reconsider its findings in <u>Feldman</u>.  <u>Id.</u> at 14 n.10.  The Court reiterates its

earlier finding in <u>Feldman</u> that the non-compete provision in the Agreement - the very same

provision at issue in <u>Feldman</u> - is enforceable under New York law.[4]  2010 WL 4286154, at *8-*10.

The Court finds that here, as in <u>Feldman</u>, that the restrictive covenant is no greater than required for

the protection of Ayco's legitimate interests, that it does not impose undue hardship on Frisch and

Oglevee, and that it is not injurious to the public.  <u>Id.</u>  Like the defendant in <u>Feldman</u>, neither Frisch

nor Oglevee brought their own clients to Ayco at the beginning of their employment; enforcement of

the provision therefore will not affect Defendants' relationships with clients they had prior to

joining Ayco.  <u>See id.</u> at *9 (citing <u>BDO Seidman</u>, 93 N.Y.2d at 392).  The Court further notes that,

as in <u>Feldman</u>, nothing in the record supports an inference of impermissible behavior by Ayco or

duress in executing the Agreement with Defendants.  2010 WL 4286154, at *9.  Finally, the Court

reiterates its finding in <u>Feldman</u> that Ayco is not a FINRA member and therefore not subject to

FINRA rules, which Defendants have cited as support for their argument that the Agreement is

injurious to the public, and that Ayco's affiliation with Mercer, a FINRA member, does not bind

Ayco to follow FINRA rules.  <u>Id.</u> at *10 (citing <u>Oppenheimer & Co., Inc. v. Deutsche Bank AG</u>, No.

09 Civ. 8154, 2010 WL 743915, at *1 (S.D.N.Y. Mar. 2, 2010)).  Having affirmed the enforceability

of the non-compete provision of the Agreement, the Court will address Plaintiff's likelihood of

success on the merits on its breach of contract claim.

---

[4] The Court also reiterates its finding above that even if California law were to apply here, California law disfavoring restrictive covenants would not, as Defendants contend, bar enforcement of the restrictive covenant in light of California's judicially recognized exception to this policy in cases involving alleged misappropriation of trade secrets.  <u>See</u> <u>Edwards</u>, 189 P.3d at 289 n.4; <u>ReadyLink Healthcare</u>, 126 Cal. App. 4th at 1022; <u>Morlife</u>, 66 Cal. Rptr.2d 731; <u>Swenson</u>, 415 F. Supp. 2d at 1104; <u>Batra</u>, 430 F. Supp. 2d at 173.

In order to prevail on an action for breach of contract, a plaintiff must provide proof of: "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." Terwilliger v. Terwilliger, 206 F.3d 240, 246 (2d Cir. 2000) (citations omitted).  As in Feldman, the Defendants do not appear to deny that these elements are met.  Feldman, 2010 WL 4286154 at *8.  Accordingly, the Court finds that Plaintiff has demonstrated a likelihood of success on its breach of contract claim.

### 2. Misappropriation of Trade Secrets

To prevail on a claim  for misappropriation of trade secrets a plaintiff must prove that 1) it possesses a trade secret and 2) defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means.  DoubleClick Inc. v. Henderson, No. 116914/97, 1997 WL 731413 (N.Y. Sup. Ct.  Nov. 7, 1997) (citing Integrated Cash Mgmt. Serv., Inc. v. Digital Transactions, Inc., 920 F.2d 171, 173 (2d Cir. 1990)).  The Court finds that Plaintiff has shown a substantial likelihood of success on its misappropriation claim.

The Compensation Reports possessed by Defendant Oglevee fit squarely within the definition of "Trade Secrets and Confidential Information" found within the TSA.  Plaintiff asserts that they contain, and Oglevee does not deny that they contain, client contact lists, the names of Ayco corporate and individual clients, confidential information regarding accounts held by Ayco clients; the amount of assets in those accounts and dates of investment; and Ayco pricing and fee information for its clients.  Cavoli Decl. ¶ 27; cf. Oglevee Aff. ¶¶ 73-78.  Finally, Oglevee admits that beginning on July 30, 2010 - almost ten months before Oglevee left Ayco - the first pages of all of these reports were marked as "Confidential."  Oglevee Aff. ¶ 77.

Additionally, despite Frisch's denial that he possesses any confidential documents, including

Compensation Reports, the company's printing logs indicate that Frisch as well as Oglevee printed out unusually large amounts of documents in the weeks prior to their respective departures, from databases containing confidential and proprietary information about Ayco's clients.  Lay Aff. ¶¶ 7-13; Lang Aff. ¶ 5.  Although Oglevee and Frisch both claim that they printed all of these records for business or personal reasons and destroyed them before they left Ayco, the unusually high number of confidential documents that Defendants printed, coinciding with their abrupt resignations from Ayco, immediate departures for UBS in violation of their Agreements with Ayco, and immediate attempts to contact their Ayco clients and persuade them to transfer their business to UBS (in Frisch's case, the very day he resigned), all support the conclusion that Plaintiff is likely to succeed on its misappropriation of trade secrets claims against both Defendants.

New York courts have held that client information such as that allegedly possessed by Oglevee and Frisch have been upheld as confidential information deserving protection.[5]  See Leo

---

[5] Not only do Defendants erroneously rely on California law to establish that they cannot be held liable for misappropriation of trade secrets, their application of this law in their Motion is also erroneous.  To prevail on a misappropriation of trade secrets claim in California courts, a plaintiff must show (1) that the misappropriated information constitutes a trade secret; (2) that the defendant "used" the secret; and (3) that the plaintiff was damaged by the misappropriation.  Therapeutic Research Faculty v. NBTY, Inc., 488 F. Supp. 2d 991, 999 (E.D.Cal. 2007).  As a variance on this claim, a plaintiff may establish "threatened misappropriation" where (1) trade secrets exist; (2) a defendant possesses those secrets, and (3) defendant has misused the secrets in the past, wrongfully refused to return them after a demand for their return has been made, or the defendant intends to improperly use or divulge them.  Central Valley Gen'l Hosp. v. Smith, 162 Cal. App. 4th 501, 527-28 (Cal. Ct. App. 2008) (citing ReadyLink Healthcare, 126 Cal. App. 4th at 1011, 1017).  Applying either of these standards, for the same reasons given in applying New York law to the facts at hand, the Court finds that Plaintiff has established a likelihood of success in showing that the information at issue constitutes a trade secret; that Defendants used this information to contact other clients and persuade them to transfer their business to UBS after leaving Ayco; and Defendants intend to continue improperly using this information.  See ReadyLink Healthcare, 126 Cal. App. 4th at 1017 (affirming issuance of preliminary injunction where "trade secret information has potential economic value because [plaintiff] went to great expense to compile the data"; and plaintiff took reasonable steps to keep the information secret by requiring employees to sign nondisclosure

Silfen, Inc., v. Cream, 29 N.Y.2d 387, 392-93 (1972) ("where the customers are not known in the trade or are discoverable only by extraordinary efforts courts have not hesitated to protect customer lists and files as trade secrets.  This is especially so where the customers' patronage had been secured by years of effort and advertising effected by the expenditure of substantial time and money."); see also Eastern Bus. Sys., Inc. v. Specialty Bus. Solutions, 292 A.D.2d 336, 337-38 (2d Dep't 2002) (client and potential client names, addresses, contact names compiled through considerable effort over several years and not available to the public are trade secrets warranting protection); Giffords Oil Co., Inc. v. Wild, 483 N.Y.S.2d 104, 106 (2d Dep't 1984); Ticor, 173 F.3d at 70 (recognizing an employee's right to injunctive relief to prevent the release of confidential information).  Moreover, Defendants' argument that Ayco took insufficient steps to protect its confidential information is without merit.  See DML at 10-12.  By Oglevee's own admission (Frisch does not recall) Ayco designated its Compensation Reports as confidential; nor do Defendants deny that the client relationship reports on the PWM database that they allegedly printed out are marked "For Internal Use Only"; access to both the PWM and Ayco Client Databases are password protected, with the latter requiring Defendants to access by clicking "OK" to agree that the information was confidential.  Oglevee Aff. ¶ 76; Frisch Aff.¶ 69; Lay Aff. ¶¶ 8, 10-11.  Like the information at issue in Feldman, the information at issue in this case was "developed over years and with substantial investments of money and effort . . . is not publicly available, is well-protected, and is valuable, in part, because of its confidentiality."  Feldman, 2010 WL 4286154 at *11.  For these reasons, Plaintiff's showing that Defendants misappropriated confidential information and trade

---

agreements that defendant signed); Morlife, 56 Cal. App. 4th at 1521 ("[W]here the employer has expended time and effort identifying customers with particular needs or characteristics, courts will prohibit former employees from using this information to capture a share of the market.").

secrets is sufficient to warrant preliminary injunctive relief.

> *3. Breach of Fiduciary Duties and Unfair Competition*

Given the scope of injunctive relief sought, see Dkt. No. 9, and the findings above, the Court need not consider the merits of Plaintiff's remaining claims at this juncture.

**C. Balance of Hardships**

The Court has found that Plaintiff has shown a likelihood of success on the merits of two of its claims. Because the balance of hardships that will ensue from the requested preliminary injunction tip decidedly in Plaintiff's favor, that injunction would obtain even upon a showing of "sufficiently serious questions going to the merits to make them a fair ground for litigation." NXIVM Corp., 364 F.3d at 476.

Absent injunctive relief, Plaintiff is threatened with the imminent, irretrievable disclosure to competitors of confidential information, developed over years through significant effort and expense, and with the loss of the goodwill and trust of its client base. Plaintiff would additionally lose the benefits of the bargain it negotiated with Defendants. Viewing potential hardships to the Defendants, the Court considers that should an injunction lie, Defendants, in accordance with terms that they agreed to, will not be able to provide for a United States competitor, services comparable to those they provided for and on behalf of Ayco, until August 10, 2011, in the case of Oglevee, and until August 17, 2011, in the case of Frisch. During that period, Defendants will continue to receive their base salaries. After August 10, 2011, Oglevee may provide these services to anyone he chooses, though he may not divulge Ayco's trade secrets, and Frisch may do the same after August 17, 2011. The Court finds that the balance of hardships that will ensue from the grant or withholding of the requested injunction tip decidedly in Plaintiff's favor.

27

## V.    CONCLUSION

Based on the foregoing discussion, it is hereby

**ORDERED**, that Plaintiff's Motion for preliminary injunctive relief (Dkt. No. 9) is

**GRANTED**; and it is further

**ORDERED**, that Defendants are preliminarily enjoined from:

(a)  associating as an individual, sole proprietor, officer, employee, partner, director,

consultant, agent or advisor with any business enterprise or person that engages in or

owns or controls a significant interest in any entity that engages in providing financial

counseling, brokerage, estate, tax and insurance planning and/or asset management

services in the United States where, in connection with such association, Defendants are

engaged in providing financial counseling, brokerage, estate, tax and insurance planning

and/or asset management services during a period of not less than ninety (90) days from

May 12, 2011 for Defendant Oglevee, and May 19, 2011 for Defendant Frisch;

(b)  copying or reproducing for Defendants' use or giving, divulging, or revealing or

otherwise disclosing to any person, corporation, partnership or other business or

professional entity, except as authorized to do so by Plaintiff, any form, document,

written material, or computer program, or any method, formula, or plan created,

developed, or utilized by Defendants, as employees of Plaintiff, or by Plaintiff;

(c)   copying or reproducing for Defendants' use or giving, divulging, revealing, or otherwise

disclosing to any person, corporation, partnership, or other business or professional

entity, except as authorized to do so by Plaintiff, any confidential business information

of Plaintiff or any client of Plaintiff and requiring that Defendants return all copies of

28

Plaintiff's confidential business information,

(d)  Defendants are hereby directed to return immediately to Plaintiff's attorney all of

Plaintiff's property, including without limitation, confidential business or trade secret

information and all other documents, computer disks or other means of electronic

storage, which contain any of Plaintiff's business information and which are in the

possession, custody, or control of the Defendants; and it is further

**ORDERED**, that Plaintiff shall pay Defendants their base salaries through August 10, 2011,

for Defendant Oglevee, and August 17, 2011, for Defendant Frisch.  Such payment shall be

retroactive from the date of this Court's May 25, 2010 Order (Dkt. No. 7); and it is further

**ORDERED**, that the Clerk serve a copy of this Order on the parties.

**IT IS SO ORDERED**.

DATED:   June 10, 2011
         Albany, New York

Lawrence E. Kahn
U.S. District Judge