UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

THE AYCO COMPANY, L.P.,

                              Plaintiff,

        -against-                                          1:11-CV-580 (LEK/DRH)

WOLFGANG K. FRISCH and STEFAN
W. OGLEVEE,

                    Defendants.
_____

## DECISION and ORDER

### I.    INTRODUCTION

        On May 24, 2011, the Ayco Company, L.P. ("Ayco" or "Plaintiff") filed a Complaint (Dkt.

No. 1) seeking monetary and injunctive relief against Wolfgang Frisch ("Defendant Frisch") and

Stefan Oglevee ("Defendant Oglevee") (collectively, "Defendants").  Defendants are former

employees of Ayco and resigned in May 2011 to work for UBS, an Ayco competitor.  Id. ¶ 1.  Ayco

alleges that Defendants: (1) breached the non-compete clauses of employment contracts

("Agreements"), and confidentiality agreements, that they entered into with Ayco; (2)

misappropriated confidential information and trade secrets; (3) engaged in unfair competition; and

(4) breached their fiduciary duties to Ayco.  Id. ¶¶ 32-34, 69-70, 75-78, 81, 85.

        On May 25, 2011, the Court granted Plaintiff's request for a temporary restraining order

("TRO") enforcing the non-compete clauses.  Dkt. No. 7.  After conducting a hearing on June 7,

2011, the Court issued a Decision and Order on June 10, 2011, granting a preliminary injunction

through August 10, 2011, for Defendant Oglevee, and August 17, 2011, for Defendant Frisch.[1]  Dkt.

_____

[1] Defendants' appeal from the June 2011 Order was dismissed by Mandate of the Second
Circuit Court of Appeals on July 18, 2011, in part because Defendants "failed to make a 'strong

No. 29 ("June 2011 Order").

On August 16, 2011, Defendants moved to stay this action and compel arbitration of

Plaintiff's claims against them pursuant to sections 3 and 4 of the Federal Arbitration Act ("FAA"),

9 U.S.C. § 1 *et seq*., or, alternatively, to dismiss the action for lack of subject matter jurisdiction and

for failure to state a claim upon which relief may be granted.  Dkt. No. 38 ("Motion").  Defendants

filed an additional Motion on October 19, 2011, construed by the Court as a Motion to strike (Dkt.

No. 61) ("Motion to strike"), requesting that the Court "refuse to consider" what Defendants claim

is impermissible legal argument in an affidavit submitted by Plaintiff's general counsel, Mae

Cavoli, in support of Plaintiff's Response to Defendants' Motion.  Dkt. Nos. 46-1 ("Cavoli

Declaration"); 61.  Ayco has filed Responses in opposition to both the initial Motion to dismiss and

the Motion to strike.  Dkt. Nos. 46; 62 ("Responses").  For the reasons stated below, Defendants'

Motions are denied.

## II.     BACKGROUND

The Court assumes the parties' familiarity with the underlying facts of this matter, and

summarizes only the facts most relevant to the determination of the present Motion to compel

arbitration.  For a more complete statement of facts and procedural history, reference is made to the

June 2011 Order.  See June 2011 Order at 2-10.

Ayco is a financial services company that provides comprehensive financial counseling and

education services for corporate executives and employees and wealthy individuals.  Cavoli Decl. ¶

6.  Ayco provides a broad range of services including tax and estate planning, wealth transfer,

_____

showing' that they are 'likely to succeed on the merits' on appeal."  Dkt. No. 44 (quoting McCue v.
City of N.Y. (In re World Trade Ctr. Disaster Sit Litig.), 503 F.3d 167, 170 (2d Cir. 2007)).

insurance planning, investment management, benefits and compensation strategies, and retirement planning.  Id. ¶ 7.  Ayco is registered with the Securities and Exchange Commission, but it is not a broker dealer and is not registered with the Financial Industry Regulatory Authority ("FINRA").  Id. ¶ 9.

Because FINRA does not require individuals to obtain a securities license in order to provide financial counseling, tax return preparation, or investment management services to clients, Ayco provides these services directly to its clients.  Id.  Ayco account managers, however, offer other services to Ayco clients, and these services are provided by the appropriately licensed Ayco affiliate offering them.  Id.

Ayco's affiliates include other investment advisors, insurance agencies, real estate brokerages, securities broker-dealers, commodities and future advisors, and banks.  Id. ¶ 8.  One affiliate, Mercer, is a broker-dealer and member of FINRA, and its "authority to do business is based on its own independent license with FINRA."  Id. ¶¶ 12-13.  Both Ayco and Mercer are wholly owned subsidiaries of The Goldman Sachs Group, Inc.  Id. ¶ 12.  Ayco is the sole limited partner of Mercer; Mercer's general partner, GS Ayco Holding LLC, is the sole limited partner of Ayco.  Id. n.4.  Ayco's and Mercer's corporate headquarters are located at the same address – 321 Broadway, Saratoga Springs, New York, 12866 – and both companies' listed telephone number is (518)-336-4000.  Louis M. Lagalante Declation Ex. 3 (Dkt. No. 38-18); Defendants' Memorandum of law in support of motion to compel arbitration (Dkt. No. 38-1) ("Defs.' Mem.") at 16.  There is also some overlap in management between Mercer and Ayco: Mercer's president, Timothy O'Hara, serves as Ayco's executive vice president; Mercer's chief financial officer, John Collins, serves as Ayco's senior vice president and chief operating officer; and Mae Cavoli is the general counsel for

3

both Ayco and Mercer.  See Defs.' Mem. at 21.  At the same time, Mercer is required by law to have a certain level of independent capitalization, and is prohibited from intermingling its corporate funds with Ayco's.  Cavoli Decl. ¶ 17.  Securities regulations also require that any business expenses that Mercer shares with its affiliates be apportioned on an arms-length basis to ensure an accurate calculation of Mercer's capital.  Id. ¶ 18.

Because Mercer's FINRA license restricts Mercer's business to transacting in specific financial products, Mercer's business primarily involves the sale of variable life insurance products and variable annuities – transactions that Ayco is legally prohibited from conducting.  Cavoli Decl. ¶ 14; see also Lagalante Decl. Ex. 3 at 6.  Pursuant to contract between Mercer and the insurance carrier whose variable products are sold to Ayco clients, any revenue generated by Mercer is paid to Mercer by the insurance carrier.  Cavoli Decl. ¶ 16.  When a client purchases a product sold by Mercer, the Ayco account manager signed to service that client receives a commission, and those funds flow from Mercer to Ayco to the account manager via Ayco's payroll.  Id.

Both Defendants were initially hired by Ayco as staff attorneys and later became account managers for Ayco.  Id. ¶¶ 20-21.  Upon being hired, Defendants signed the Agreements, which were revised in 2010 and which Defendants again signed.  Cavoli Decl. Ex. C (Dkt. No. 46-4).  The Agreements contained the following clause:

> The Employee acknowledges that the headquarters of Ayco is in Saratoga Springs, New York, that the business of Ayco is operated and coordinated from New York, that activities of Employee are ultimately governed by and the Employee ultimately reports to Ayco executives resident in New York, and that Employee will receive training and orientation from Ayco in New York.  Accordingly, Employee hereby irrevocably submits to the jurisdiction of any New York court or federal court sitting in the Northern District of New York over any suit, action, or proceeding arising out of or relating to this Agreement and hereby waives to the fullest extent permitted by law, any objection that the Employee may now or hereafter have to such jurisdiction

4

> or to the venue of any suit, action or proceeding brought in such court and any claim that such suit, action or proceeding has been brought in any inconvenient forum. Employee covenants and agrees that he or she will not file any action against Ayco except in the courts of the State of New York or the federal court sitting in the Northern District of New York.

Id. II.E.7.  Ayco trained the Defendants as account managers, and, over the years, Defendants serviced many clients for Ayco.  See Cavoli Decl. ¶¶ 23-26.

As account managers, Defendants applied to become registered FINRA representatives in order to obtain securities licenses, which they claim – and Plaintiff does not appear to dispute – they were directed to do by Ayco.  Wolfgang K. Frish Declaration (Dkt. No. 38-8) ¶¶ 4, 7-8; Stefan W. Oglevee Declaration (Dkt. No. 38-11) ¶¶ 3-4.  As part of their applications, Defendants signed a FINRA Form U-4 Application for Securities Industry Registration ("Form U-4 Agreement"), which contains a provision stating that each Defendant agrees to arbitrate "any dispute, claim or controversy that may arise between me and my firm[2] . . . or any other person . . . that is required to be arbitrated under the [FINRA] rules."  Louis B. Lagalante Decl. Ex. 1 (Dkt. No. 38-16) ("Form U-4"); Frisch Decl. (Dkt. No. 38-8) ¶ 8; Oglevee Decl. (Dkt. No. 38-11) ¶ 8.  In addition to signing the Form U-4 Agreement, Defendants were also required to pass an examination, for which they prepared by reviewing training materials paid for by Ayco.  Frisch Decl. ¶ 9; Oglevee Decl. ¶ 9.  Defendants obtained their respective securities licenses in or about 2002, and maintained these licenses through Mercer until their departures from Ayco in 2011.  Frisch Decl. ¶ 4; Oglevee Decl. ¶ 4.

## III.   STANDARD OF REVIEW

---

[2] Ayco states, and Defendants do not dispute, that Mercer, not Ayco, was Defendants' "firm" for purposes of the Form U-4 Agreement.  Plaintiff's Memorandum of law in opposition to Defendants' motion to compel arbitration (Dkt. No. 46) ("Pl.'s Mem.") at 11.

**A. Motion to Compel Arbitration**

The standard of review for a motion to compel arbitration under § 4 of the FAA "is essentially the same standard that the Court applies when it reviews a motion for summary judgment." D'Antuono v. Serv. Road Corp., 789 F. Supp. 2d 308, 319 (D. Conn. 2011) (citing DuBois v. Macy's East, Inc., 338 F. App'x. 32, 33 (2d Cir. 2009) (summary order); Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003)). "The party seeking an order compelling arbitration must 'substantiate [its] entitlement [to arbitration] by a showing of evidentiary facts that support its claim that the other party agreed to arbitration.'" D'Antuono, 789 F. Supp. 2d at 319 (quoting Oppenheimer & Co., Inc. v. Neidhardt, 56 F.3d 352, 358 (2d Cir. 1995)) (alterations in original). If the party seeking arbitration meets this burden, "the party opposing [arbitration] may not rest on a denial but must submit evidentiary facts showing that there is a dispute of fact to be tried." Oppenheimer, 56 F.3d at 358. The same standard applies to motions to stay judicial proceedings pending arbitration under § 3 of the FAA. Barbieri v. K-Sea Transp. Corp., No. 1:05-cv-4950, 2006 WL 3751215, at *3 (E.D.N.Y. Dec. 19, 2006).[3]

---

[3] Defendants claim that their Motion to stay judicial proceedings and compel arbitration "should be treated as a motion to dismiss for want of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1)." Mot. at 22-23. Defendants' Motion cites in support of this argument a report-recommendation issued by United States Magistrate Judge Marian W. Payson in the Western District of New York, which, in turn, cites only a Third Circuit opinion in support of that proposition. Id. (citing E.E.O.C. v. Hooters of America, Inc., No. 06-CV-6138CJS, 2007 WL 64163, at *2 (W.D.N.Y. Jan. 9, 2007) (quoting Evans v. Hudson Coal Co., 165 F.2d 970, 972 (3d Cir. 1948))). A review of the docket in the Hooters case further reveals that a consent decree was issued in that case, and that the district court never issued a decision adopting or rejecting the findings of the magistrate judge. See Hooters, No. 06-CV-6138CJS, Dkt. Nos. 33, 34, 40 (W.D.N.Y. consent decree filed August 20, 2007). In any case, the cases referenced above make plain that within this Circuit, district courts must apply the summary judgment standard of review, not the standard for a motion to dismiss, to motions to stay and compel arbitration.

**B. Motion to Dismiss**

*1. Lack of Subject Matter Jurisdiction*

In considering a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(1), a court must "accept all factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to the plaintiff." Jaghory v. N.Y. State Dep't of Educ., 131 F.3d 326, 329 (2d Cir. 1997). "Dismissal is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." Raila v. United States, 355 F.3d 118, 119 (2d Cir. 2004). However, it is the plaintiff who bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence. Aurrechione v. Schoolman Transp. Sys., Inc., 426 F.3d 635, 638 (2d Cir. 2005).

*2. Failure to State a Claim*

In order to survive a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6), the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, __, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Such a determination "requires the reviewing court to draw on its judicial experience and commons sense." Iqbal, 129 S. Ct. at 1950. The court is limited to accepting as true the factual allegations contained in the complaint and drawing all inferences in favor of the plaintiff. Allaire Corp. v. Okumus, 433 F.3d 248, 249-50 (2d Cir. 2006). A complaint may be dismissed pursuant to Rule 12(b)(6) only where it appears that there are not "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. 544, 570 (2007). Plausibility requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the

alleged misconduct]," id. at 556, and "more than a sheer possibility that a defendant has acted

unlawfully." Iqbal, 129 S. Ct. at 1949.  Where the court is unable to infer more than the mere

possibility of the alleged misconduct based on the pleaded facts, the pleader has not demonstrated

that he is entitled to relief and the complaint is subject to dismissal.  Id. at 1950.

## IV.   DISCUSSION

### A.  Motion to Strike

Defendants claim that certain paragraphs in the Cavoli Declaration violate Rule 7.1 of the

Local Rules of Practice for the Northern District of New York, which states that "[a]n affidavit must

not contain legal arguments but must contain factual and procedural background as appropriate for

the motion being made."  N.D.N.Y. L.R. 7.1(a)(2).  Ayco denies that the Cavoli Declaration contains

any improper legal arguments.  Resp. to Defendants' motion to strike at 1.  Alternatively, Plaintiff

contends that, to the extent these paragraphs do contain any legal arguments, these arguments also

appear in its Memorandum of law and are supported by references to documents other than the

Cavoli Declaration.  Id.  As a result, Ayco argues, "there is no reason for the Court to refuse to

consider the arguments."  Id. (internal quotation marks omitted).  While the Court will certainly

consider the legal arguments as set forth in Plaintiff's Opposition Memorandum, it will disregard the

portions of Cavoli Declaration, if any, that set forth legal arguments.  See Oneida Indian Nation v.

County of Oneida, No. 5:70-CV-35, 2011 WL 2728388, at *22 n.24 (N.D.N.Y. July 12, 2011)

(Kahn, J.).

Defendants argue that the following statements in the Cavoli Declaration are legal

conclusions: (1) Ayco "cannot appoint Mercer to serve as an agent in FINRA matters"; (2) "any

benefits received by Ayco from the Mercer relationship are at best indirect"; and (3) Ayco "is not

subject to FINRA rules" because it is a non-member of FINRA.  Mot. to strike at 1-2 (quoting Cavoli

Decl. ¶¶ 10, 15).  Additionally, Defendant contends that the Cavoli Declaration sets forth "legal

conclusions that Mercer is an entity separate and distinct from Ayco" in stating that Mercer has "a

certain level of independent capitalization" and "is prohibited by law from intermingling its

corporate funds with those of Ayco," and that Mercer's shared business expenses with Ayco and

other affiliates are therefore "apportioned on an arms-length basis to ensure an accurate calculation

of Mercer's capital."  Mot. to strike at 2 (quoting Cavoli Decl. ¶¶ 17-18).

 Upon reviewing the relevant portions of the Cavoli Declaration, the Court will disregard the

statements therein that Ayco cannot appoint Mercer to serve as an agent in FINRA matters and that

Ayco is not subject to FINRA rules.  As addressed below, the Court agrees with the conclusion

reached by another court in a similar case, Ayco Co. v. Becker, No. 1:10-CV-0834, 2011 WL

3651027, at *7-8 (N.D.N.Y. Aug. 18, 2011), that the argument that Mercer acted as Ayco's agent in

FINRA matters is wholly without merit.  However, whether an express or implied agency

relationship existed between the two companies is a legal issue, and the Court therefore does not

consider the statement in the Cavoli Declaration that such a relationship could not exist.  Likewise,

while the Court reiterates its earlier holdings in the June 2011 Order and in Ayco Co. v. Feldman,

No. 1:10-CV-1213, 2010 WL 4286154, at *10 (N.D.N.Y. Oct. 22, 2010), that Ayco is not bound by

FINRA rules, this is a legal question.  The Court will therefore disregard the Cavoli Declaration's

statement as to whether Ayco is bound by FINRA rules in this case.

 As to the remaining statements referenced in Defendants' Motion to strike, these are not legal

conclusions and the Court therefore will not disregard them as such.  As discussed below, it is a

question of law whether Ayco derived any "direct benefits" from Defendants' entering into the Form

U-4 Agreements with Mercer.  However, Cavoli's assertion that "any benefits received by Ayco from the Mercer relationship are at best indirect" is a more generalized assertion of fact, not a legal argument.  See Cavoli Decl. ¶ 10 (emphasis added).  Similarly, the other portions of the Cavoli Declaration with which Defendants take issue – the statements that Mercer is required by law to have "a certain level of independent capitalization" and "is prohibited by law from intermingling its corporate funds with those of Ayco," and that Mercer's shared business expenses with Ayco and other affiliates are therefore "apportioned on an arms-length basis to ensure an accurate calculation of Mercer's capital" – are all factual assertions.  Id.  ¶¶ 17-18. Although some of these assertions do reference certain legal or regulatory requirements that Mercer and Ayco must follow, these are not legal arguments per se; Defendants do not claim that Cavoli actually misstates the legal requirements imposed on Mercer and Ayco.  The Court considers that these statements are "appropriate for the motion being made," L.R. 7.1(a)(2), and Defendants' Motion to strike these statements is denied.

### B.  Motion to Stay and Compel to Arbitrate

Defendants argue that, despite the fact that it is not a signatory to the FINRA arbitration agreement, Ayco should nevertheless be compelled to submit its alleged claims against Defendants to arbitration before FINRA, both pursuant to FINRA rules and on the common law theories of agency, veil-piercing/alter ego, and estoppel.  See Defs.' Mem. at 7-13.  Defendants further argue that this dispute should be submitted to arbitration in the interests of public policy.  Id. at 17-20.  Ayco reiterates the argument that it has made successfully in this case and in other cases – namely, that it is not bound by FINRA rules as a non-member of FINRA.  Pl.'s Opp. Mem. at 11.  Ayco further argues that this dispute is not governed by FINRA rules because it arose out of Defendants' breach of their contracts with Ayco, none of which were signed by Mercer.  Id. at 12-14.  Finally,

Ayco contends that none of the contractual theories on which Defendants rely apply in this case.  Id. at 15-22.

### 1. Arbitrability Under FINRA

In support of their Motion, Defendants rely on the arbitration clause in the Form U-4 Agreement, which they claim should be enforced in this case because they signed it "[a]t Ayco's direction" even though Ayco itself was not a party to the agreement.  Defs.' Mem. at 6-7; Frisch Decl. ¶ 8; Oglevee Decl. ¶ 8.  Defendants also cite FINRA Rule 13200(a), which provides that "a dispute must be arbitrated . . . if the dispute arises out of the business activities of a member or an associated person and is between or among: Members; Members and Associated Persons; or Associated Persons."[4]  Defs.' Mem. 6-7.  However, Ayco "is not a FINRA member and cannot be compelled to arbitrate under Rule 13200."  Oppenheimer & Co., Inc. v. Deutsche Bank AG, No. 09 Civ. 8154, 2010 WL 743915, at *2 (S.D.N.Y. Mar. 2, 2010), cited in Feldman, 2010 WL 4286154, at *10.  Moreover, the Court has already previously held both in this case and in Feldman that because it is not a member of FINRA, Ayco is not bound by FINRA rules.  June 2011 Orderat 23; Feldman, 2010 WL 4286154, at *10.  Accordingly, Defendants' Motion to compel arbitration on the basis of FINRA rules is denied.

### 2. Arbitrability Under Common Law Exceptions

"[A] court should be wary of imposing a contractual obligation to arbitrate on a non-

---

[4] A "Member" is defined as "any broker or dealer admitted to membership in FINRA."  FINRA R. 13100(o).  "Associated Person" is defined as "a natural person who is registered or has applied for registration under the Rules of FINRA."  FINRA R. 13100(a) & (r).  The parties do not dispute that Mercer is a Member of FINRA and that Defendants are Associated Persons within the meaning of these Rules.

contracting party." <u>Smith-Enron Cogeneration, Inc. v. Smith Cogeneration Int'l, Inc.</u>, 198 F.3d 88, 97 (2d Cir. 1999).  Absent an express agreement to arbitrate, then, a signatory to an arbitration agreement must establish that enforcement against a non-signatory is warranted on the basis of at least one of the following five theories: "(1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; and (5) estoppel." <u>Thomson-CSF, S.A. v. Am. Arbitration Ass'n</u>, 64 F.3d 773, 776 (2d Cir. 1995).  These are "limited exceptions" that "'follow ordinary principles of contract and agency' that serve to 'protect parent companies' when subsidiaries enter into arbitration agreements; for this reason, 'anything short of requiring a <u>full</u> showing of some accepted theory under agency or contract law imperils a vast number of parent corporations.'" <u>Oppenheimer</u>, 2010 WL 743915, at *2 (quoting <u>Merrill Lynch Inv. Managers v. Optibase, Ltd.</u>, 337 F.3d 125, 130 (2d Cir. 2003)) (emphasis in original).  While reserving the right to pursue either "incorporation by reference" or "assumption" as a basis for compelling arbitration "should discovery make it appropriate to do so," Defendants rely on the latter three – agency, veil-piercing/alter ego, and estoppel – in support of their present Motion.  Defs.' Mem. at 7 n.2.  The Court addresses each of these arguments in turn.

a.  Agency

Defendants contend that Mercer acted as Ayco's agent by "using its member firm status to obtain the securities licensing and registration necessary for Defendants, as Ayco employees, to secure their clients."  Defs.' Mem. at 13.   Therefore, Defendants claim, Ayco is bound by the arbitration clause in Form U-4, which Mercer "entered into for Ayco's benefit."  <u>Id.</u>

"Traditional principles of agency law may bind a non-signatory to an arbitration agreement."

Thompson-CF, 64 F.3d at 777.  "An agency relationship exists under New York law when there is agreement between the principal and the agent that the agent will act for the principal and the principal retains a degree of control over the agent."  In re Parmalat Sec. Litig., 375 F. Supp. 2d 278, 290 (S.D.N.Y. 2005) (citing Commercial Union Ins. Co. v. Alitalia Airlines, 347 F.3d 448, 462 (2d Cir. 2003)).  An agent's authority to act on the principal's behalf "may be express, implied or apparent."  Flame Cut Steel Prod., Inc. v. Performance Foams & Coatings, Inc., 46 F. Supp. 2d 222, 228 (E.D.N.Y. 1999).  However, "[t]he element of control often is deemed the essential characteristic of the principal-agent relationship."  Parmalat, 375 F. Supp. 2d at 290 (citing Meese v. Miller, 79 A.D.2d 237, 242 (N.Y. App. Div. 1981); Restatement (Second) of Agency § 14 cmt. a (1958)).  Finally, "conclusory allegations of a general agency relationship between a signatory and non-signatory do not suffice to compel . . . unwilling non-signatories to arbitrate under that theory."  AICO Int'l v. Merrill Lynch & Co., 98 F. App'x 44, 46-47 (2d Cir. 2004) (citing Optibase, 337 F.3d at 130-31).

Although they have established that Mercer and Ayco shared a "mutually beneficial affiliation," Defendants have not set forth sufficient evidence to support a full showing that Mercer consented to act "on [Ayco]'s behalf and subject to its control."  Phoenix Cos. v. Abrahamsen, No. 05 Civ. 4894, 2006 WL 2847812, at *6 (S.D.N.Y. Sept. 28, 2006) (quoting Optibase, 337 F.3d at 129).  As the court found in Becker, Defendants adduce no evidence demonstrating that Mercer and Ayco shared an understanding that Ayco would control Mercer's sponsorship of Defendants' FINRA applications.  Becker, 2011 WL 3651027, at *7.  Indeed, the court in that case noted that "the record establishes that [Ayco], as a non-member of FINRA, is prohibited from sponsoring Form U-4 Agreements and controlling this process; and an agency relationship cannot exist where the alleged

13

agent performs an act that principal could not on its own perform."  Id. (citing Mouawad Nat'l Co. v. Lazare Kaplan Int'l, Inc., 476 F. Supp. 2d 414, 423 (S.D.N.Y. 2007) ("It is axiomatic that where a principal does not possess the power to bind itself to a third person in contract, there is no power that the principal can confer on an agent that will enable the agent to enter the contract on the principal's behalf.").  For substantially the same reasons articulated by the court in Becker, 2011 WL 3651027, at *7-8, the Court concludes that Defendants have failed to establish that an express or implied agency relationship existed between Mercer and Ayco.[5]

### b.  Veil-Piercing/Alter Ego

Defendants also contend that Ayco should be compelled to arbitrate pursuant to the arbitration clause in Form U-4 by "piercing" Mercer's corporate "veil," because Ayco dominates and controls Mercer to the extent that Ayco is Mercer's alter ego.  Defs.' Mem. at 13-17.  New York law requires a party seeking to pierce the corporate veil to show that: (1) "the owner exercised complete domination over the corporation with respect to the transaction at issue"; and (2) "such domination

---

[5] The Court also notes that, to the extent Defendants claim that an agency relationship existed between Mercer and Ayco on the basis of apparent authority, this argument too must fail. "Under New York law . . . the existence of 'apparent authority' depends upon a factual showing that the third party relied upon the misrepresentation of the agent because of some misleading conduct on the part of the principal – not the agent."  Flame Cut Steel Prod. Co., 46 F. Supp. 2d at 228 (quoting Hallock v. N.Y., 64 N.Y.2d 224, 231 (N.Y. 1984)).  As the court concluded in Becker, Defendants have adduced no evidence that, prior to signing the Form U-4 Agreements, either Ayco or Mercer in any way "represented that [Mercer] was [Ayco]'s agent," or that Defendants actually "signed the Form U-4 Agreement[s] because [they] believed that Mercer was [Ayco]'s agent." Becker, 2011 WL 3651027, at *8 (citing A.I.A. Holdings, S.A. v. Lehman Bros., Inc., No. 97-CV-4978, 2002 WL 88226, at *11 (S.D.N.Y. Jan. 23, 2002); Property Advisory Grp. v. Bevona, 718 F. Supp. 209, 214 (S.D.N.Y. 1989)) (emphasis in original).  Defendants' argument that Mercer acted as Ayco's agent is therefore rejected on this basis as well.

was used to commit a fraud or wrong that injured the party seeking to pierce the veil."[6]  Am. Fuel

Corp. v. Utah Energy Dev. Co., 122 F.3d 130, 134 (2d Cir. 1997) (citing Morris v. N.Y. State Dep't

of Tax & Fin., 623 N.E.2d 1157, 1160-61 (N.Y. 1993)).  Whether an entity exercises complete

control over another is "a fact specific inquiry," Thomson-CSF, 64 F.3d at 777, and courts generally

consider the following factors in making this determination:

> (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of
> funds; (4) overlap in ownership, officers, directions, and personnel; (5) common office space,
> address and telephone numbers of corporate entities; (6) the degree of discretion shown by
> the allegedly dominated corporation; (7) whether the dealings between the entities are at
> arm[']s length; (8) whether the corporations are treated as independent profit centers; (9)
> payment or guarantee of the corporation's debts by the dominating entity[;] and (10)
> intermingling of property between the entities.

MAG Portfolio Consultant, GMBH v. Merlin Biomed Grp., 268 F.3d 58, 63 (2d Cir. 2001) (citation

---

[6] Defendants cite to Thomson-CSF, 64 F.3d at 777, which states that "the court will pierce
the corporate veil . . . to prevent fraud or other wrong, or where a parent dominates and controls a
subsidiary." Defs.' Mem. at 19. Defendants concede that Ayco did not commit any fraud in
requiring them to sign contracts waiving their right to arbitration, but argue that the Court "should
find Ayco's gaming of the regulatory and court systems, as well as its overreaching in forcing
employees to register through an affiliate while simultaneously forcing them to effectively waive
their right to arbitration constitute the type of 'other wrong' the Second Circuit seeks to prevent."
Id. Even assuming – without so finding – that, absent a showing of either fraud or corporate
domination by Ayco, Defendants' allegations of Ayco's conduct would constitute "other wrong"
sufficient to warrant veil piercing here, Defendants have nonetheless failed to make a sufficient
factual showing of wrongful conduct on Ayco's part to justify veil piercing. See Thomson-CSF, 64
F.3d at 780 ("Anything short of requiring a full showing of some accepted theory under agency or
contract law imperils a vast number of parent corporations"); see also id. at 777 (quoting Wm.
Passalacqua Builders, Inc. v. Resnick Developers S., Inc., 933 F.2d 131, 138-39 (2d Cir. 1991)
("Liability . . . may be predicated either upon a showing of fraud or upon complete control by the
dominating corporation that leads to a wrong against third parties.")); cf. Smoothline Ltd. v. N. Am.
Foreign Trading Corp., No. 00 CIV. 2798, 2002 WL 273301, at *6 (S.D.N.Y. Feb. 27, 2002)
(allegation that corporation shifted assets out of another to leave it effectively judgment-proof
constituted sufficient wrong to justify veil piercing) (citing Thrift Drug v. Prescription Plan Serv.
Corp., 1 F. Supp. 2d 387, 388 (S.D.N.Y. 1998); Freeman v. Complex Computing Co., 979 F. Supp.
257, 260 (S.D.N.Y. 1997)).  To the extent Defendants seek to compel arbitration on the premise that
veil piercing is necessary to prevent some wrong other than fraud, the Court rejects this argument.

and quotation omitted).

Defendants point mainly to the following in support of their argument that Ayco controls and dominates Mercer: (1) Mercer's public disclosures, which, Defendants claim "show that it is just a facility operated by Ayco's employees, used to serve Ayco's needs"; (2) Mercer's undercapitalization; (3) the "overlap" between Ayco's and Mercer's corporate structure and among their executive officers and management; and (4) that Ayco 'sand Mercer's corporate headquarters share the same listed address and telephone number.  Defs.' Mem. at 14-17.

The Court finds that Defendants' allegations  "are insufficient to establish the type of day-to-day control necessary to disregard corporate separateness." Oppenheimer, 2010 WL 743915, at *4 (finding allegations of undercapitalization, overlap in personnel, and shared address and telephone number insufficient to compel veil piercing) (quoting In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000, 342 F. Supp. 2d 207, 216 (S.D.N.Y. 2004)) (internal quotation marks omitted).  Although Defendants claim that Ayco owns a 99% interest in Mercer, "complete ownership of a subsidiary's stock is insufficient, by itself, to pierce the corporate veil.  'Actual domination, rather than the opportunity to exercise control, must be shown.'" Oppenheimer, 2010 WL 743915, at *4 (quoting De Jesus v. Sears, Roebuck & Co., 87 F.3d 65, 69 (2d Cir. 1996)).  That overlap exists between Mercer and Ayco's executive officers and management is insufficient to make such a showing; overlap among personnel is "commonplace as generally-accepted corporate form, and [is] insufficient without more, as a matter of law, to eviscerate the presumption of corporate separateness." McAnaney v. Astoria Fin. Corp., 665 F. Supp. 2d 132, 144-45 (E.D.N.Y. 2009) (collecting cases).  Beyond conclusory assertions that Mercer was "operated by Ayco's employees" and "used to serve Ayco's needs," Defendants have failed to demonstrate actual domination of

16

Mercer by Ayco.

Moreover, as a registered broker-dealer whose authority to do business is based on its own independent license with FINRA, Mercer is required to comply with a host of regulations that require it to operate as a separate entity with highly specialized policies and procedures.  Cavoli Decl. ¶¶ 12-13, 17; see also Becker, 2011 WL 3651027, at *5.  Mercer is also prohibited by law from intermingling its corporate funds with Ayco's, and Ayco is legally prohibited from engaging in much of Mercer's current business activity.  Cavoli Decl. ¶¶ 14-16; see also Becker, 2011 WL 3651027, at *5.  Aside from their conclusory assertion that Mercer is undercapitalized, Defendants have not presented any evidence of intermingling of funds, an absence of corporate formalities, improper use of Mercer's funds, or payment of Mercer's debts by Ayco.  Defendants "do[] not allege, for example, that [Mercer's] board of directors did not hold regular meetings, that its officers did not act on the company's behalf, that [Mercer] failed to maintain proper accounts and records, or that [Ayco] improperly accessed [Mercer's] funds."  Oppenheimer, 2010 WL 743915, at *5 (citing In re Amaranth Natural Gas Commodities Litig., 587 F. Supp. 2d 513, 538 (S.D.N.Y. 2008) (declining to pierce corporate veil where plaintiffs presented "no allegations of the disregard of corporate formalities, inadequate capitalization, intermingling of funds or property, reduced discretion by any entity, failure to deal at arms' length, or payment of the debts of one entity by another"); In re Parmalat Sec. Litig., 375 F. Supp. 2d 278, 269-97 (S.D.N.Y. 2005) (declining to pierce corporate veil where plaintiff failed to allege "an intermingling of funds or a failure to adhere to corporate formalities"); In re Ski Train Fire in Kaprun, 342 F. Supp. 2d at 216 (declining to pierce corproate veil where plaintiffs "provided no evidence that [a subsidiary] failed to comply with corporate formalities, make its own day-to-day operational decisions, or remain sufficiently capitalized").

Having considered all of the above factors, the Court finds that Defendants have "failed to establish the level of corporate control necessary to justify piercing Mercer's corporate veil and binding [Ayco], a non-signatory to the Form U-4 Agreement." Becker, 2011 WL 3651027, at *5.

### c. Estoppel

Defendants argue that Ayco should be bound to arbitrate under a theory of "direct benefits" estoppel because Ayco, not Mercer, is the "real party in interest to the arbitration agreement." Defs.' Mem. at 7-12. A non-signatory to an arbitration agreement may be compelled to arbitrate if the non-signatory "knowingly accepted the benefits of an agreement with an arbitration clause." MAG Portfolio, 268 F.3d at 61 (citation and quotation omitted). However, such benefits must "flow directly from the agreement in question," Adelphia Recovery Tr. v. Bank of Am., N.A., No. 05 Civ. 9050, 2009 WL 2031855, at *8 (S.D.N.Y. July 8, 2009) (citing Thomson-CSF, 64 F.2d at 779). By contrast, a benefit is merely indirect "where the nonsignatory exploits the contractual relation of parties to an agreement, but does not exploit (and thereby assume) the agreement itself." MAG Portfolio, 268 F.3d at 62 (citing Thomson-CSF, 64 F.2d at 778-79).

For the same reasons stated by the court in Becker, the Court finds that Defendants have failed to show that Ayco directly benefitted from the Form U-4 Agreement. As the court in Becker noted, Ayco may have benefitted from Defendants' obtaining securities licenses as a result of signing the agreement with Mercer, inasmuch as Defendants' "ability to sell securities became an additional service that [they] could offer to [their] clients." Becker, 2011 WL 3651027, at *6. This alone, however, does not suffice to show a benefit flowing directly from the Form U-4 Agreement itself. First, it is unclear whether Ayco received any direct financial benefit from Defendants' signing the

Form U-4 Agreement and obtaining their securities licenses, as any revenue generated from the sale of securities (i.e., by Mercer) is paid to Mercer by the insurance carrier whose products are sold to Ayco's clients, and the contract that provides for that payment is between Mercer and the carrier, not Ayco.  Cavoli Decl. ¶ 16.  Further, even if Plaintiff somehow financially benefitted from Defendants' obtaining securities licenses, Defendants "ha[ve] failed to sufficiently establish that this benefit flowed directly from the Form U-4 Agreement (and, in particular, its arbitration clause)."  Becker, 2011 WL 3651027, at *6; see also Oppenheimer, 2009 WL 4884158, at *6 (finding that allegations of party seeking to compel arbitration that non-signatory "gained financially from [its affiliate]'s actions as a broker-dealer" were insufficient to establish a direct benefit from arbitration agreement).

While Defendants point to the fact that they were directed by Ayco to register with FINRA through Mercer, and that Ayco paid for the training materials used by Defendants to study for their licensing examinations, this establishes at most that Ayco "sought to exploit its relationships with Mercer and Defendant[s], and the contractual relationship between those parties."  Becker, 2011 WL 3651027, at *6.  However, benefits are not direct where a third party merely "exploits the contractual relationship of two parties to an agreement."  Oppenheimer, 2010 WL 743915, at *2 (citing MAG Portfolio, 268 F.3d at 61).  Furthermore, Ayco "had its own separate relationships and agreements" with Defendants, "from which it benefited directly" – including agreements between Ayco and Defendants that any dispute between them arising out of relating to said agreements would be litigated in New York state and federal courts.  Phoenix Cos., 2006 WL 2847812, at *7; see also June 2011 Order at 11-18 (rejecting Defendants' argument that California law governed this dispute and finding New York law governed).  Nor have Defendants shown that Ayco, for instance: (1) had any involvement in the formation or negotiation of the Form U-4 Agreement; (2) is mentioned in the

Form U-4 Agreement; (3) received fees as a result of the Form U-4 Agreement; or (4) has attempted to enforce against Defendants any particular provision of the Form U-4 Agreements. Becker, 2011 WL 3651027, at *6 (citations omitted); see also Phoenix Cos., 2006 WL 2847812, at *7. The record does not indicate that Ayco itself receives any sort of remuneration as a result of requiring its employees to register with FINRA through Mercer. Rather, as the court found in Becker, the record indicates "that this requirement reflects nothing more than a logical goal of driving business from one corporate-owned entity (Plaintiff) to another (Mercer), at no adverse expense (and with some indirect benefits) to the former." Becker, 2011 WL 3651027, at *7. For all of the foregoing reasons, Defendant's Motion to compel arbitration is denied.

### 3. Public Policy

As a final matter, the Court only addresses in brief Defendants' contention that "Ayco's effort to force Frisch and Oglevee to waive their rights to arbitrate is void as against public policy." Defs.' Mem. at 17-20. In support of this argument, Defendants cite FINRA Interpretive Memo 13000, which provides that "[i]t may be deemed conduct inconsistent with just and equitable principles of trade and a violation of [FINRA Rules] for a member or person associated with a member to . . . fail to submit a dispute for arbitration under [FINRA Rules]." Id. at 17. This is not Defendants' first attempt to make this argument. In the June 2011 Order as well as in Feldman, the Court has rejected the argument that the Agreements violated public policy, and found that Ayco is not bound by FINRA Rules. June 2011 Order at 23; Feldman, 2010 WL 4286154, at *10. Defendants proffer no further law or facts that would support a finding otherwise, and the Court declines Defendants'

invitation to reconsider its findings in these cases.[7]

### B.      Motion to Dismiss Pursuant to Rule 12(b)(6)

Defendants argue that their Motion should also be treated as a motion to dismiss under Fed.

R. Civ. P. 12(6).  See Defs.' Mem. at 22.  However, as discussed at note 3, *supra*, a motion to

compel arbitration is not treated as a motion to dismiss pursuant to Rule 12(b)(6).  Accordingly,

Defendants' Motion to dismiss is likewise denied.

### C.  Motion to Dismiss for Lack of Subject Matter Jurisdiction

Defendants cite to the report-recommendation in Hooters, which was never formally adopted

by the district court, for the proposition that their Motion should also be treated as a motion to

dismiss for lack of subject matter jurisdiction.  Id. (citing Hooters, 2007 WL 64163, at *2 (quoting

Evans v. Hudson Coal Co., 165 F.2d at 972).  Even if either this report-recommendation, or the

Third Circuit's decision in Evans, were binding on this Court – which they are not – Rule 12(b)(1)

provides only that, where a court finds issues are arbitrable and stays a case until arbitration is

completed, the court is temporarily deprived of subject matter jurisdiction over the dispute.  See id.

Because the Court here denies Defendants' Motion to compel arbitration, it also denies as moot

---

[7] The two cases that Defendants cite to support their contention that Ayco has violated their right to arbitrate this dispute are inapposite here.  Thomas James Assoc., Inc. v. Jameson, 102 F.3d 60 (2d Cir. 1996), involved a claim brought by a securities firm seeking to avoid arbitration despite the fact that it signed a Form U-4 agreement with the employee seeking to arbitrate the claim pursuant to that agreement.  The unreported New York state court case cited by Defendants, Merrill Lynch Int'l Fin. Inc. v. Gutkin, Defs.' Mem. Ex. 2 (Dkt. No. 38-3), is also inapplicable to this case because that court based its decision to compel arbitration on the fact that the party seeking to avoid arbitration, a non-FINRA member, had been substituted as a party to the agreement at issue. Defendants make no claim here that Mercer at any time substituted Ayco as a party to the Form U-4 agreement.  These cases provide no legal support for Defendants' public policy arguments and the Court therefore does not consider them.

Defendants' Motion to dismiss for lack of subject matter jurisdiction.

### V.  CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' Motion to stay and compel to arbitrate (Dkt. No. 38) is

**DENIED** in its entirety; and it is further

**ORDERED**, that Defendants' Motions to strike (Dkt. No. 61 and 63) are **DENIED**; and it is

further

**ORDERED**, that the Clerk serve a copy of this Order on the parties.

**IT IS SO ORDERED**.


DATED:        January 09, 2012
              Albany, New York



                                        Lawrence E. Kahn
                                        U.S. District Judge

22