UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

THE AYCO COMPANY, L.P.,

                     Plaintiffs,

     -against-                             1:11-CV-0580 (LEK/TWD)

WOLFGANG K. FRISCH; and STEFAN
W. OGLEVEE,

                    Defendants.

_____

**MEMORANDUM-DECISION and ORDER**

## I.    INTRODUCTION

On May 24, 2011, Plaintiff The Ayco Company, L.P. ("Plaintiff" or "Ayco") filed a

Complaint in diversity against Defendants Wolfgang K. Frisch and Stefan Oglevee (collectively,

"Defendants") alleging breach of a noncompete clause, misappropriation of confidential information

and trade secrets, unfair competition, and breach of fiduciary duties.  See generally Dkt. No. 1

("Complaint").  Defendants are former employees of Ayco who resigned in May 2011 and

immediately began working for UBS Financial Services Inc. ("UBS"), an Ayco competitor,

allegedly in violation of their employment agreements with Ayco (the "Agreement").  Id. ¶ 8.

In its Complaint, Plaintiff seeks damages as well as a temporary restraining order ("TRO")

and preliminary injunction enforcing the Agreement's ninety-day noncompete clause.  Id. at 23-24.

On May 25, 2011, the Court granted Plaintiff's request for a TRO.  Dkt. No. 7.  After receiving

additional submissions from the parties and holding a show-cause hearing, by Memorandum-

Decision and Order filed on June 10, 2011, the Court granted Plaintiff's request for a preliminary

injunction, finding that New York law applied to Plaintiff's claims and that under New York law

Plaintiff was likely to succeed on the merits of its claims for breach of contract and misappropriation of trade secrets.  Dkt. No. 29 (the "June Order"); Ayco Co. v. Frisch, 795 F. Supp. 2d 193 (N.D.N.Y. 2011) (Kahn, J.).[1]

Plaintiff filed an Amended Complaint on September 6, 2011.  Dkt. No. 41.  On February 8, 2012, Defendants each filed an Answer to the Amended Complaint that was accompanied by counterclaims against Plaintiff.  Dkt. Nos. 65, 66 (together, the "Counterclaims").  Defendant Frisch's and Defendant Oglevee's Counterclaims were substantively identical to each other. Compare Dkt. No. 65, with Dkt. No. 66.  In both Defendant's Counterclaims, the first counterclaim was for wrongful injunction under Federal Rule of Civil Procedure 65(c).  Dkt. No. 65 ¶¶ 21-25, at 35-36; Dkt. No. 66 ¶¶ 21-25, at 35-36.  The four remaining counterclaims in both were: (1) that Plaintiff engaged in tortious conduct in compelling Defendants to execute the Agreement; (2) that Plaintiff intentionally interfered with Defendants' prospective business relationships by enforcing the Agreement; (3) that Plaintiff engaged in unfair competition by requiring Defendants to execute the Agreement; and (4) that Defendants were entitled to declaratory relief to the effect that the Agreement was invalid and unenforceable.  See Dkt. No. 65 ¶¶ 26-48, at 36-39; Dkt. No. 66 ¶¶ 26-48, at 36-40.  Each of these four counterclaims were brought under California law.  On March 23, 2012, Plaintiff filed a Motion under Rule 12(b)(6) to dismiss the Counterclaims for failure to state a claim upon which relief could be granted.  Dkt. No. 69 ("March Motion").

---

[1]  Defendants subsequently appealed the Court's grant of injunctive relief to the Second Circuit.  Dkt. Nos. 12, 30.  On appeal, Defendants moved the Second Circuit to stay both the TRO and the preliminary injunction, but the motions were denied on September 20, 2011 because Defendants had failed to satisfy Federal Rule of Appellate Procedure 8.  Dkt. No. 44 ("Mandate"). In addition, the Second Circuit noted in its Mandate that it believed Defendants had "failed to make a strong showing that they [were] likely to succeed on the merits on appeal"  Id. (internal quotation marks and citation omitted).

Before the Court could rule on Plaintiff's March Motion, on April 12, 2012, Defendants each filed an Answer accompanied by amended counterclaims as permitted by Rule 15(a)(1)(B). Dkt. Nos. 78, 79 (together, the "Amended Counterclaims").  Like Defendants' Counterclaims, the parties' Amended Counterclaims are substantively identical to each other.  <u>Compare</u> Dkt. No. 78, <u>with</u> Dkt. No. 79.  No new counterclaims were added to the Amended Counterclaims, and each counterclaim that appeared in the Counterclaims appears again in the Amended Counterclaims with little to no substantive change.  Indeed, although some language was added to the counterclaims themselves, the most noticeable change from the Counterclaims to the Amended Counterclaims was to the counterclaims' ordering.[2]  On April 25, 2012, Plaintiff responded to Defendants' Amended Counterclaims by filing a Motion under Rule 12(b)(6) to dismiss for failure to state a claim.  Dkt. No. 80 ("April Motion").

Plaintiff's April Motion to dismiss Defendants' Amended Counterclaims is now before the Court for decision.  As discussed in greater detail below, because the Court finds that New York law continues to govern the validity of the Agreement, the Court grants Plaintiff's April Motion in its entirety and dismisses Defendants' Amended Counterclaims in full.  As a result, the Court denies Plaintiff's March Motion as moot.

## II.   BACKGROUND

The Court assumes the parties' familiarity with the underlying facts of this matter and summarizes only the facts most relevant to the determination of the April Motion to dismiss.  For a

---

[2]  The Counterclaims' second counterclaim became the Amended Counterclaims' fifth counterclaim, and each of the Counterclaims' subsequent counterclaims advanced a spot in the Amended Counterclaims (*i.e.*, the third counterclaim became the second counterclaim and so on). <u>Compare</u> Dkt. No. 78, <u>with</u> Dkt. No. 79.  The Counterclaims' first counterclaim maintained its lead position in the Amended Counterclaims.

more complete statement of facts and procedural history, reference is made to the June Order as well as to the Court's other Order in this action.  See Ayco Co., 795 F. Supp. 2d at 195-200; Ayco Co. v. Frisch, No. 1:11-CV-580, 2012 WL 42134, at *1-3 (N.D.N.Y. Jan. 9, 2012) (Kahn, J.).

Ayco is a Delaware limited partnership with its principal place of business in Saratoga Springs, New York.  Compl. ¶ 10.  It provides "fee-based financial counseling, education and investment management services to individuals and families throughout the United States."  Id. Defendants are both individuals who currently reside in California.  Id. ¶¶ 11-12; Dkt. No. 78 ¶ 1, at 32; Dkt. No. 79 ¶ 1, at 32.

On September 8, 1998, Defendant Oglevee began employment at Ayco's Albany, New York office as a Staff Attorney.  Compl. ¶ 17.  He then transferred to Ayco's Irvine, California office on May 16, 1999.  Id.  By January 2002, he had been promoted to Account Manager.  Id.  On November 1, 2000, Defendant Frisch began employment at Ayco's Irvine, California office as a Staff Attorney.  Id. ¶ 16.  By the end of 2004, he, too, had been promoted to Account Manager.  Id. Defendants were at all times Ayco's at-will employees.  See Compl. Ex. A, § II.E.1 ("The Employee shall remain 'at will' and this Agreement shall not be construed as a contract of employment for a specific period of time . . . .").

In 2010, Defendants signed the employment Agreement at issue in this litigation.  The Agreement's Termination clause contains a noncompete provision that reads:

> In the event the Employee terminates employment before the expiration of the Notice of Termination Period or terminates employment without giving notice, employee covenants that for the balance of the Notice of Termination Period or, if no notice is given, ninety (90) days . . . the Employee will not associate (including but not limited to association as an individual, sole proprietor, officer, employee, partner, director, consultant, agent or advisor) with any Competitive Enterprise in the United States where, in connection with such association, Employee is engaged in providing [financial counseling, brokerage, estate, tax and insurance planning and/or asset

4

management services], and the period of the restrictions provided for in paragraph 11.A.3 above shall be increased, if no notice is given, by ninety (90) days . . . or the unfulfilled balance of the Notice of Termination Period if notice has been given.

Id. § II.D.

The Agreement also provides that:

Employee further acknowledges that the restrictions contained herein are reasonable and necessary to protect the legitimate interests of Ayco and do not impose any greater restraint than is reasonably necessary to protect the confidential information, goodwill, training, and other business interests of Ayco and that the enforcement by Ayco of the provisions contained herein, will cause no undue hardship on the Employee. Employee further acknowledges that in the event of a breach of the provisions of this Agreement, Ayco will not have an adequate remedy at law.  Employee therefore agrees that Ayco shall be entitled to temporary, preliminary, and permanent injunctive relief for any violation of Sections II A, B, C and D.

Id. § II.E.2. Finally, the Agreement contains a choice-of-law clause that provides that the Agreement "shall be governed and construed and enforced in accordance with the laws of the State of New York, without giving effect to any conflict of laws provisions."  Id. § II.E.5.

In May 2011, Defendants resigned from their positions at Ayco without giving the ninety-day notice required by the Agreement and immediately began their employment at UBS, a direct competitor to Ayco.  Dkt. No. 78 ¶ 16, at 35; Dkt. No. 79 ¶ 15, at 35.  Soon thereafter, Ayco filed its Complaint seeking monetary and injunctive relief against Defendants for their alleged violation of the Agreement.  Compl.  In accordance with Federal Rule of Civil Procedure 65(c), as security against any harm that the injunctive relief might cause to Defendants if wrongly imposed, Ayco posted a bond in the amount of $1,000,000.  Dkt. No. 25.  The Court granted Plaintiff injunctive relief in its June Order.

Defendants now argue in their Amended Counterclaims that the Agreement is invalid and unenforceable under California law.  Defendants contend that the Agreement is invalid in its entirety

5

because "[t]he process Ayco followed left [Defendants] with no meaningful choice in the formation of the [Agreement]." Dkt. No. 78 ¶ 14, at 34; Dkt. No. 79 ¶ 13, at 34. As the factual basis for this contention, Defendants allege that they were given only two weeks to review the Agreement before signing it and that Ayco executives actively discouraged Defendants from reviewing the Agreement with an attorney during that time, made it clear that the terms of the Agreement were nonnegotiable, and told Defendants that failure to sign the Agreement promptly would be "bad for [their] careers" while failure to sign it altogether would result in their termination. Dkt. No. 78 ¶ 7-8, 11-12, at 33-34; Dkt. No. 79 ¶ 7, 10-11, at 33-34. Defendants allege that because of these "pressures," they were "compelled to execute the [Agreement] immediately" in order to "protect [their] livelihood and to protect [themselves] and [their families] from financial hardship." Dkt. No. 78 ¶ 13, at 34; Dkt. No. 79 ¶ 12, at 34.

Defendants also contend that the Agreement's noncompete clause is invalid and unenforceable under California law even absent Ayco's alleged use of high-pressure tactics to force Defendants to sign the Agreement. According to Defendants, the noncompete clause "violates the law of the State of California . . ., purports to permit Ayco to force [Defendants] from [their] profession and livelihood for a period of months, and makes no allowance for [Defendants'] interest in [their] clients' good will or for [their] clients' right to contract with whomever they so choose." Dkt. No. 78 ¶ 15; Dkt. No. 79 ¶ 14.

Based on these allegations, Defendants bring their Amended Counterclaims against Plaintiff. They seek monetary damages of at least $1,000,000 for each of their counterclaims except for the counterclaim alleging unfair competition, for which they seek an injunction "barring Ayco from engaging in any future unlawful competition against [them], including without limitation by seeking

to enforce restrictive covenants contained in [the Agreement]." Dkt. No. 78 at 42; Dkt. No. 79 at 41-42.

### III.   STANDARD OF REVIEW

When a court evaluates a motion to dismiss for failure to state a claim, under Federal Rule of Civil Procedure 12(b)(6), it must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the nonmovant's favor. Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007). Mere "conclusions of law or unwarranted deductions of fact" need not be accepted as true. First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 771 (2d Cir. 1994). A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Plausibility requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct]," Twombly, 550 U.S. at 556, and "more than a sheer possibility that a defendant has acted unlawfully," Iqbal, 556 U.S. at 678. This pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned the-defendant-unlawfully-harmed-me accusation." Id. at 678 (quoting Twombly, 550 U.S. at 556). Thus, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. Where a court is unable to infer more than the mere possibility of the alleged misconduct based on the pleaded facts, the pleader has not demonstrated that he is entitled to relief and the complaint is subject to dismissal. See id. at 679.

### IV.   DISCUSSION

#### A.  Choice of Law

As a threshold matter, the Court must first determine whether New York or California law applies to Defendants' state law counterclaims. That determination is potentially dispositive here, given that Defendants bring each of those claims under California law.

In a diversity case, a court must apply the choice-of-law rules of the state in which it sits. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941). In New York, courts follow the "substantial relationship" test, under which they will honor the parties' choice of law in a contract unless (1) the chosen state has no substantial relationship to the parties; or (2) applying the law of the chosen state would contravene a fundamental policy of a state that has a materially greater interest than does the chosen state. Estee Lauder v. Batra, 430 F. Supp. 2d 158, 170 (S.D.N.Y. 2006) (quoting RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 187) (citations and quotations omitted). If, however, the choice-of-law clause is not worded broadly enough to cover matters other than the construction of the contract's terms, New York courts have refused to find tort claims that arise incident to the contract to be governed by the chosen state's law. See Finance One Public Co. v. Lehman Bros. Special Financing, Inc., 414 F.3d 325, 335 (2d Cir. 2005); Krock v. Lipsay, 97 F.3d 640, 645 (2d Cir. 1996) (holding that a choice-of-law provision did not apply to a fraud claim where it stated only that "[t]his Mortgage shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts"); Chiste v. Hotels.com L.P., 756 F. Supp. 2d 382, 411 (S.D.N.Y. 2010). In determining which state's law to apply in tort actions, New York courts undertake a different analysis than they do in contract cases. First, a court must consider whether an actual conflict exists between the state laws that are implicated in the case. Innoviant Pharmacy v. Morganstern, 390 F. Supp. 2d 179, 187 (N.D.N.Y. 2005). If such a conflict exists, a court must apply the law of the state with the greatest interest in the litigation. White Plains Coat & Apron Co.

v. Cintas Corp., 460 F.3d 281, 284 (2d Cir. 2006).

In its June Order granting Plaintiff a preliminary injunction, the Court performed a choice-of-law analysis based on detailed affidavits submitted by the parties concerning the relevant contacts with New York and California, and it determined that New York law applied both to Plaintiff's breach-of-contract claim and to its tort claims, even though the tort claims were found to fall outside the scope of the Agreement's narrowly drafted choice-of-law clause.  Ayco, 795 F. Supp. 2d at 200-05.  Applying the relevant New York choice-of-law rules to the clause and the breach-of-contract claim, the Court found that: (1) a substantial relationship existed between the parties and New York; and (2) New York, not California, had the materially greater interest in having its law applied to the dispute.  Id. at 201-03.  Applying the relevant rules to the tort claims, the Court found that: (1) there was no conflict between New York's and California's law governing the types of tort claims asserted in Plaintiff's Complaint; and (2) New York, not California, had the greater interest in having its law applied to the dispute because "the alleged conduct that gave rise to Plaintiff's tort law claims is the same as that which gave rise to its breach of contract claims" and because "the vast majority of the alleged harm occurred in New York where Plaintiff is headquartered."  Id. at 203-05 (internal quotation marks and citations omitted).  For the Court's full analysis, reference is made to the June Order.

In its Memorandum of law, Plaintiff argues that the Court's choice-of-law determinations in the June Order are dispositive of those same determinations on this Motion to dismiss.  Specifically, Plaintiff argues that the counterclaims fall within the scope of the Agreement's choice-of-law clause because they "directly implicate" the Agreement, in that each counterclaim cannot be resolved without first determining whether the process by which the Agreement was entered into was

unlawful or whether the noncompete clause is itself unlawful.  Dkt. No. 80-1 ("Plaintiff's Memorandum of Law") at 10.  And because the Court has already determined that New York law governs the Agreement, Plaintiff argues that New York law must also apply to Defendants' counterclaims, which rise or fall depending on whether the Agreement and its terms are valid.  See id.  Defendants counter that California law governs their state law counterclaims because, as tort claims, they fall outside the scope of the Agreement's choice-of-law clause—just as the Court had found in the June Order in regard to Plaintiff's tort claims.  Dkt. No. 83 ("Oglevee's Memorandum of Law") at 6-7; Dkt. No. 84 ("Frisch's Memorandum of Law") at 15.

In the alternative, Plaintiff argues that even if Defendants' counterclaims fall outside the scope of the Agreement's choice-of-law clause, New York's choice-of-law rules require the Court to apply New York law to resolve them.  Id. at 10-11.  Defendants in turn argue that the rules require California law to be applied to their counterclaims because: (1) conflicts exist between the relevant New York and California law; and (2) California, not New York, has the greater interest in having its law applied to the counterclaims.  Oglevee Mem. at 7-8; Frisch Mem. at 9.  In support of the latter contention, Defendants point to the Court's "interest prong" analysis in the June Order.  In that analysis, the Court found that Plaintiff would suffer harm primarily in New York, where it was headquartered, if its claims proved true.  Ayco, 795 F. Supp. 2d at 204.  Defendants argue that if the Court applies the same reasoning to their counterclaims, the Court must conclude that California law applies to them because Defendants suffered the harm they allege primarily in California.[3]

---

[3] Defendant Oglevee alleges that he suffered harm primarily in California for the following reasons:

> Oglevee lived and worked in California for over a decade, and suffered economic damages in California from Ayco's tortious conduct.  Further, senior Ayco executives and employees pressured him in California to sign the Agreement and threatened him

Oglevee Mem. at 9; Frisch Mem. at 9.

Despite Defendants' arguments to the contrary, the Court concludes that New York law applies to their state law counterclaims. Unlike Plaintiff's tort claims, which are independent of its breach-of-contract claim and do not depend on the validity of the Agreement to be sustained, Defendants' state law counterclaims are inextricably entwined with the Agreement. As discussed *infra*, each of Defendants' counterclaims have at their root the argument that the Agreement is in one way or another invalid. Indeed, only if the Court finds the formation of or the noncompete clause in the Agreement to be invalid can it ultimately grant Defendants' counterclaims.

Thus, were the Court to accept Defendants' contention that California law applies to its counterclaims, the Court could be setting itself up to issue contradictory rulings on one of the essential questions presented in this action: Is the Agreement valid? As the Court ruled in its June Order, New York law applies to Plaintiff's breach-of-contract claim. Therefore, the Court will apply New York contract law in determining the validity of the formation and terms of the Agreement. If, as Defendants argue, the Court were to apply California law to the counterclaims, the Court would end up applying two different substantive bodies of law to the same issues, with the possibility that it could arrive at two different and opposing resolutions. The Court accordingly holds that because New York law applies to the formation and construction of the Agreement, New York law also applies to Defendants' counterclaims, which cannot be decided without first deciding the validity of the Agreement.

─────────────────────

in California with termination if he did not. All the conduct and damage that must be proven in order to make out Oglevee's statutory claim for unfair competition occurred in California.

Oglevee Mem. at 9. Defendant Frisch alleges that he suffered harm primarily in California for substantially the same reasons. Frisch Mem. at 9.

**B. Analysis**

The Court next considers whether Defendants' Amended Counterclaims state claims that can survive this Motion to dismiss.

At the outset, the Court notes that it has already decided the validity of the Agreement's noncompete clause in its June Order.  Discussing a prior case involving the same Plaintiff and the same Agreement, the Court held:

> The Court reiterates its earlier finding in Feldman that the non-compete provision in the Agreement—the very same provision at issue in Feldman—is enforceable under New York law.  The Court finds that here, as in Feldman, that the restrictive covenant is no greater than required for the protection of Ayco's legitimate interests, that it does not impose undue hardship on Frisch and Oglevee, and that it is not injurious to the public.  Like the defendant in Feldman, neither Frisch nor Oglevee brought their own clients to Ayco at the beginning of their employment; enforcement of the provision therefore will not affect Defendants' relationships with clients they had prior to joining Ayco.

Ayco, 795 F. Supp. 2d at 207 (citing and discussing Ayco Co. v. Feldman, No. 1:10-CV-1213, 2010 WL 4286154, at *8-10 (N.D.N.Y. Oct. 22, 2010) (Kahn, J.)).  Defendants allege nothing in their Amended Counterclaims that, taken as true, dictates that the Court depart from its prior finding here.

The Court also notes that in regard to Defendants' claim of duress in the formation of the Agreement, Defendants presented essentially the same allegations to the Court in opposition to the preliminary injunction as they do in their Amended Counterclaims and on this Motion to dismiss:

> Ayco forced Defendants to sign the new 2010 agreement, including the Notice/Noncompetition provision, without permitting Defendants to review or negotiate the terms of that agreement—including any post-employment restrictive covenants.  To the contrary, Ayco presented Defendants with this agreement—which contains the new, onerous, Noncompetition provision—as a "take it or leave it" proposition, harassed Defendants until they could no longer take it, and even told Mr. Frisch that taking the agreement to his personal counsel would "be bad" for his career at Ayco.  All of these factors led Defendants to conclude they had to sign these

> unilaterally imposed, non-negotiable, and illegal (in California) and overbroad (in New York) agreements, or be fired.

Dkt. No. 19 at 19. Confronted with these allegations, the Court held in its June Order "that, as in Feldman, nothing in the record supports an inference of impermissible behavior by Ayco or duress in executing the Agreement with Defendants." Ayco, 795 F. Supp. 2d at 207-08 (citing Feldman, 2010 WL 4286154, at *9). To the extent that Defendants' allegations remain the same here, the Court once again finds them to be meritless.

### 1. State Law Counterclaims

Defendants' second counterclaim alleges that Plaintiff violated California's Unfair Competition Law, Business and Professional Code § 17200 et seq., by committing "unlawful and unfair business practices against [Defendants]." Dkt. No. 78 ¶ 27-28, at 37; Dkt. No. 79 ¶ 26-27, at 36-37. Plaintiff's allegedly "unlawful and unfair" acts are:

> forcing [Defendants], by wrongly exploiting its superior bargaining position and unfairly threatening termination, to sign an overly broad employment agreement not created to protect any legitimate interest of Ayco, and imposed by Ayco without any consideration for its execution by [Defendants], containing restrictive covenants that violate California law and which are invalid and unenforceable thereunder, and by tortiously interfering with the prospective economic advantage [Defendants] expected to enjoy with [their] clients after [their] departure from Ayco to UBS.

Dkt. No. 78 ¶ 28, at 37; Dkt. No. 79 ¶ 27, at 36-37.

Defendants' third counterclaim alleges that Plaintiff committed a tort against Defendants when it "compelled [them], under threat of termination, to execute the employment agreements" which contain an "invalid and unenforceable" noncompete clause. Dkt. No. 78 ¶¶ 32, 35, at 38; Dkt. No. 79 ¶¶ 31, 34, at 37-38. Defendants contend that they suffered harm as result of Plaintiff's tortious conduct because it "impos[ed] false and invalid contractual burdens on [them], hinder[ed] [their] transition to [their] new employment, [and] derail[ed] and/or delay[ed] [their] pursuit of

13

[their] chosen profession."[4]  Dkt. No. 78 ¶ 36, at 38; Dkt. No. 79 ¶ 35, at 38.

Defendants' fourth counterclaim alleges that Plaintiff intentionally interfered with their prospective business relationships by

> preventing [Defendants'] clients from contacting or otherwise communicating with [them], imposing false and invalid contractual burdens on [them], misrepresenting to one or more of [their] clients the quality and/or accuracy of [their] work, and/or [their] competence generally, improperly coercing [them] into signing employment agreements with covenants not to compete that are void, unenforceable and violative of California public policy, and wrongfully requesting and obtaining wrongful injunctions that prevented [them] from engaging in legitimate competition, and prevented [them] from working in [their] chosen filed, and from advising [their] clients.

Dkt. No. 78 ¶ 41, at 39; Dkt. No. 79 ¶ 40, at 39.  According to Defendants, this "interference has caused and will continue to cause actual disruptions and other injuries to [their] relationships with [their] clients."  Dkt. No. 78 ¶ 43, at 40; Dkt. No. 79 ¶ 42, at 39.

Finally, Defendants' fifth counterclaim seeks declaratory relief under 28 U.S.C. § 2201 to the effect that the Agreement was "obtained through economic duress, is unconscionable and is, therefore, unenforceable."  Dkt. No. 78 ¶¶ 45-52, at 40-41; Dkt. No. 79 ¶ 44-51, at 40-41.

The Court holds that Defendants' second, third, and fifth counterclaims each fail to state a

---

[4]  Defendant Oglevee also alleges that he was harmed by Plaintiff's "misrepresenting to one or more of his clients the quality and/or accuracy of his work, and his competence generally."  Dkt. No. 78 ¶ 36, at 38.  The Court notes that it is unclear whether Defendant Oglevee alleges that Plaintiff made specific misrepresentations to Defendant Oglevee's clients about his competence or the quality of his work, or whether the "misrepresentation" Defendant Oglevee refers to is the possible negative impression left on his clients by Plaintiff's enforcement of the noncompete clause.  Defendant Oglevee's fourth counterclaim, in which he alleges that Plaintiff "intentionally interfered with [their business relationships] by, among other things, . . . misrepresenting to one or more of [their] clients the quality and/or accuracy of [their] work," does not help to resolve the uncertainty.  Dkt. No. 78 ¶ 41, at 39.  If, on one hand, the allegation is of specific misrepresentations made by Plaintiff, the Court finds that they do not meet the pleading requirements of Rule 8 because Defendant Oglevee's Amended Counterclaims are devoid of any supporting factual allegations.  If, on the other hand, the allegations are of harm caused by Plaintiff's enforcement of the noncompete clause, they are mooted by the Court's holding that the clause was valid and enforceable.

claim upon which relief could be granted because neither the Agreement's noncompete clause nor the Agreement's formation are unlawful under New York contract law. See supra. Furthermore, because the noncompete clause is valid and enforceable, Plaintiff's enforcement of it cannot serve as the basis for Defendants' fourth counterclaim for tortious interference with prospective business relationships. See, e.g., Smith v. Meridian Tech., Inc., 927 N.Y.S.2d 141, 144-45 (N.Y. App. Div. 2011) (dismissing a claim for tortious interference with contract because a former employee did not engage in "wrongful conduct" by seeking to enforce a noncompete agreement against a former employee). Although Defendants allege that Plaintiff "prevent[ed] [their] clients from contacting or otherwise communicating with [them]," Defendant Oglevee's Memorandum of law makes clear that Defendants' contact with their clients was severed by the preliminary injunction and not, as might be implied by the language of the allegation, some independent effort on Plaintiff's part to block clients from communicating with Defendants that might constitute "wrongful conduct." See Oglevee Mem. at 22 ("The Court, and a jury, can reasonably infer that Ayco's purpose in blocking Mr. Oglevee from any contact with his clients under the PI Order was to insure that Ayco could contact those clients . . . ." (emphasis added)).

Accordingly, Defendants' second, third, fourth, and fifth counterclaims are dismissed for failure to state a claim.

### 2. Federal Wrongful Injunction Counterclaim

Defendants' first counterclaim is for wrongful injunction under Federal Rule of Civil Procedure 65(c). Defendants argue that "the injunctions . . . were, and are, wrongful because the ultimate decision on the merits, after a full hearing and after Ayco fails to prevail on its claims, will establish that Ayco should not have requested that [Defendants] be so enjoined." Dkt. No. 78 ¶ 24,

at 36; Dkt. No. 79 ¶ 23, at 36.  They seek to recover against the bond Plaintiff was required to post as security under Rule 65(c).

Plaintiff argues, however, that Defendants' counterclaim is premature because there has not yet been a final adjudication of the case on the merits in Defendants' favor.  Pl.'s Mem. at 12 (citing Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 910 F.2d 1049, 1054-55 (2d Cir. 1990); Medafrica Line, S.P.A. v. Am. W. African Freight Conference, 654 F. Supp. 155, 156 (S.D.N.Y. 1987); Factors Etc., Inc. v. Pro Arts, Inc., 562 F. Supp. 304, 308 (S.D.N.Y. 1983); Wainwright Sec. Inc. v. Wall Street Transcript Co., 80 F.R.D. 103, 107 (S.D.N.Y. 1978)).  Defendant Oglevee responds that the counterclaim is not premature "because it does not seek immediate enforcement of the injunction bond, but recovery after trial."  Oglevee Mem. at 12.  In support of this contention, Defendant Oglevee cites Polymer Technology Corp. v. Mimran, 975 F.2d 58, 64 (2d Cir. 1992), in which the court held, in *dicta*, "that an award from an injunction bond prior to final judgment is premature."  Defendants also challenge Plaintiff's citation to Jamaica Lodge 2188 v. Railway Express Agency, Inc., 200 F. Supp. 253, 255 (E.D.N.Y. 1961), for support for the proposition that "[a]ny action upon the bond which is commenced prior to a final determination in the underlying action is premature and must be dismissed."  Pl.'s Mem. at 12.  Finally, Defendants argue that allowing their wrongful injunction counterclaim to proceed will promote judicial economy.  Oglevee Mem. at 12; Frisch Mem. at 7.

Defendants' citation to Polymer Technology Corp. and their attempts to distinguish Jamaica Lodge 2188 are unavailing because those cases do not control when a party may move for recovery against a security bond on the basis of wrongful injunction.  Rather, courts in this Circuit have held that Blumenthal controls on that question.  See, e.g., U.S. D.I.D. Corp. v. Windstream Comm'ns,

Inc., No. 12 Civ. 4023, 2013 WL 67257, at *5 (S.D.N.Y. Jan. 7, 2013) (citing and discussing

Blumenthal in a section entitled "Recovery on an Injunction Bond Requires a Final Adjudication on

the Merits").  In Blumenthal, the Second Circuit held that "[a] party has been 'wrongfully enjoined'

. . . if it is ultimately found that the enjoined party had at all times the right to do the enjoined act."

910 F.2d at 1054; see also H.E. Fletcher Co. v. Rock of Ages Corp., 326 F.2d 13, 16-17 (2d Cir.

1963) (holding that the injunction bond renders the movant "liable for damages if in the end it was

determined that [the enjoined party] was within its rights in" engaging in enjoined conduct); accord

Note, *Recovery for Wrongful Interlocutory Injunctions Under Rule 65(c)*, 99 HARV. L. REV. 828,

836-42 (1986).  More specifically, "[t]he focus of the 'wrongfulness' inquiry"—as least in this

Circuit—"is whether, *in hindsight in light of the ultimate decision on the merits after a full hearing*,

the injunction should not have issued in the first instance."  Blumenthal, 910 F.2d at 1054 (emphasis

added); see also Guzman v. Local 32B-32J, Serv. Emps. Int'l Union, AFL-CIO, 72 F.3d 260, 263

(2d Cir. 1995) (stating that liability on the injunction bond turns on "the ultimate issue of whether

the enjoined party had the legal right to act as it wished").  In fact, the Blumenthal court stated that a

claim against the bond "is a separate and distinct claim from the merits of the underlying

controversy" and does not even arise "except upon a favorable ruling on the lack of merit to the

movant's case."  910 F.2d at 1056.  Thus, because there has not yet been an "ultimate decision on

the merits after a full hearing" in this case, Defendants' counterclaim for wrongful injunction is

premature.

Accordingly, Defendants' first counterclaim is dismissed without prejudice as premature.

## V.   CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Plaintiff's Motion (Dkt. No. 80) to dismiss Defendants' First Amended Counterclaims (Dkt. Nos. 78, 79) is **GRANTED in its entirety**; and it is further

**ORDERED**, that Defendant Frisch's First Amended Counterclaims (Dkt. No. 78) are **DISMISSED** in accordance with this Memorandum-Decision and Order; and it is further

**ORDERED**, that the Defendant Oglevee's First Amended Counterclaims (Dkt. No. 79) are **DISMISSED** in accordance with this Memorandum-Decision and Order; and it is further

**ORDERED**, that Plaintiff's Motion (Dkt. No. 69) to dismiss Defendant's Counterclaims (Dkt. Nos. 65, 66) is **DENIED as moot**; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on the parties.

**IT IS SO ORDERED**.

DATED:     January 17, 2013
           Albany, New York


Lawrence E. Kahn
U.S. District Judge

18